UNITED STATES of America,

v.

Beverly BOGLE.

UNITED STATES of America,

v.

Marianne EUTSEY.

UNITED STATES of America,

v.

Rafael S. PENA.

UNITED STATES of America,

v.

Alan P. FOGEL.

UNITED STATES of America,

v.

Marie D. PAUL.

UNITED STATES of America,

v.

Steven M. ROBERTS, et al.

UNITED STATES of America,

v.

Yolanda Rogers PEOPLES.

UNITED STATES of America,

v.

Augusto GOMEZ.

Nos. 87–856–CR–MARCUS, 87–858–CR–KEHOE, 88–14001–CR–DAVIS, 88–8019–CR–DAVIS, 87–855–CR–ARONOVITZ, 88–006–CR–RYSKAMP, 87–848–CR–KEHOE and 87–964–CR–HASTINGS.

United States District Court,
S.D. Florida.

June 15, 1988.

Leon B. Kellner, U.S. Atty., Miami, Fla., John R. Bolton, Asst. Atty. Gen., William F. Weld, Asst. Atty. Gen., Douglas Letter, Thomas Millet, Karen Scrivseth and John Depue, Dept. of Justice, for U.S.

Stewart Abrams, Asst. Federal Public Defender, Miami, Fla., for defendant Bogle.

Kenneth Swartz, Asst. Federal Public Defender, Miami, Fla., for defendant Eutsey.

Stephen Bronis, Miami, Fla., for defendant Peña.

Michael Salnick, West Palm Beach, Fla., for defendant Fogel.

Philip Brutus, Asst. Federal Public Defender, Miami, Fla., for defendant Paul.

Luis Rojas, Hialeah, Fla., for defendants S. Roberts, J. Roberts, and Kelly.

Edward McHale, Miami, Fla., for defendant Peoples.

Melvyn Kessler, Miami, Fla., for defendant Gomez.

Benson B. Weintraub, Nat. Ass'n of Criminal Defense Lawyers, Miami, Fla., amicus curiae.

John R. Steer, General Counsel, U.S. Sentencing Com'n, Paul M. Bator, Andrew L. Frey, Kenneth S. Geller, Stephen G. Gilles, Washington, D.C., for U.S. Sentencing Com'n, amicus curiae.

Before KING, Chief Judge, ROETTGER, ARONOVITZ, HOEVELER, GONZALEZ, PAINE, KEHOE, SPELLMAN, DAVIS, HASTINGS, NESBITT, MARCUS, SCOTT, ZLOCH, and RYSKAMP, District Judges, and ATKINS, Senior District Judge.

MARCUS, District Judge.

At issue today is a constitutional challenge to the validity of the Sentencing Guidelines ("Guidelines") promulgated by the United States Sentencing Commission ("Commission") pursuant to the Sentencing Reform Act of 1984 as amended ("Act"). Pub.L. No. 98–473, Title II, 98 Stat. 1976, 2017 (1984), *amended by* Sentencing Act of 1987, Pub.L. No. 100–182, 101 Stat. 1266 (1987). We are called upon to decide the validity of an Act of Congress, one of the "gravest and most delicate" tasks that a Court will ever face. *See Rostker v. Goldberg,* 453 U.S. 57, 65, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981). Because of the paramount importance of the issue to this district in particular, as well as our desire to promote procedural uniformity and avoid disparate sentencing, we decided

to hear these cases *en banc.*[1] *See United States v. Anaya,* 509 F.Supp. 289, 293–94 (S.D.Fla.1980) *(en banc ), aff'd sub nom. United States v. Zayas–Morales,* 685 F.2d 1272 (11th Cir.1982). Eight cases were consolidated for the purposes of deciding this issue. Argument was taken before the full Court on April 21, 1988.

The Act was promulgated as part of the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, and reflects a substantial effort to remedy unwarranted disparities in sentencing. In furtherance of the establishment of a uniform determinate federal sentencing system, the Act establishes a Commission to promulgate for all federal crimes binding rules, characterized as "Guidelines," and non-binding interpretive commentary and policy statements. The Guidelines essentially create, for each criminal offense, a narrow sentencing range that reflects the characteristics of the defendant, and the circumstances of the offense, and severely restricts the sentencing discretion now employed by federal judges. The Guidelines became effective on November 1, 1987, and apply to crimes committed after that date.

The Defendants and *amicus curiae,* the National Association of Criminal Defense Lawyers, challenge the constitutionality of the Guidelines for three basic reasons: first, they contend that the creation of the Commission and its placement in the judicial branch violates the separation of powers principle because the function of issuing general rules fixing punishment belongs to the legislative branch of government and may not be exercised by Article III judges, especially in concert with the executive branch of government; second, they argue that Congress cannot delegate this "core" legislative function at all, but that even if the legislative branch could accomplish such a delegation, this Act is so lacking in intelligible principles and rules

as to be standardless and thereby unconstitutional; finally, they claim that the creation of binding Guidelines strips the sentencing judge of discretion in imposing sentence and therefore violates the Defendants' due process rights.

The Department of Justice has conceded that the placement of the Commission in the judicial branch of government impermissibly violates separation of powers principles, because it regards the issuance of sentencing guidelines, within the framework of the enabling legislation, to be exclusively an executive prerogative. The Department has argued, however, that the Commission's placement in the judicial branch may be remedied simply by recasting the Commission as executive in nature and housing it within that branch of government. Finally, the Commission, appearing as *amicus curiae,* has argued that "Congress may constitutionally create an independent body in the judicial branch that is authorized to perform the special sort of activity at issue here—rulemaking that is in aid of the judicial function of pronouncing sentence, and that is intended to rationalize and control the delegated sentencing discretion of federal judges." [Memorandum of the United States Sentencing Commission as *Amicus Curiae* In Support of the Constitutionality of the Sentencing Guidelines at 2.] [hereinafter "Commission Brief"]. In the alternative, the Commission and the Department have asserted that even if some constitutional infirmity is founded on the placement of the Commission in the judicial branch, the Commission may be recognized constitutionally as an independent regulatory agency.

In spite of the great deference we accord the judgment of Congress, *Rostker,* 453 U.S. at 65, 107 S.Ct. at 2652, and the wisdom and skill with which the Commission undertook to accomplish its mission, we believe that the placement of the Com-

---

1. Other districts also have considered this question *en banc. See, e.g., United States v. Allen,* 685 F.Supp. 827 (N.D.Ala.1988) (en banc); *United States v. Lopez,* 684 F.Supp. 1506 No. Cr 88–050–R (C.D.Cal. May 5, 1988) (en banc); *United States v. Bolding,* 683 F.Supp. 1003 (D.Md.1988) (en banc). Generally, the courts that have considered this question are divided as to the Act's constitutionality. *See* Petition for a Writ of Certiorari Before Judgment to the United States Court of Appeals for the Eighth Circuit, at 9–11 nn. 10 & 11, *United States v. Mistretta,* No. 87–1904 (U.S. May 19, 1988) (collecting cases).

mission in the judicial branch of the United States and the requirement that its function must be performed by at least three federal judges collide fundamentally with the doctrine of separation of powers, and hold that the Guidelines are unconstitutional on that ground. The unprecedented rulemaking authority vested in the Commission is sweeping in its breadth, and ongoing in nature; within the ambit of the enabling legislation, the Commission has been given the plenary authority to fix the level of punishment across the entire spectrum of the federal criminal code, and, over many years, to amend these general and prospective rules as the wisdom of time and experience and study may dictate. The task conferred upon this Commission—to ordain and properly apportion punishment—necessarily requires the assessment of disparate theories of penology, the selection of basic choices, and the allocation of scarce governmental resources. We think the Commission has been called upon to make the kinds of sensitive, political and general policy determinations that the judicial branch of government is least equipped to make. Simply put, we do not believe that judges may be called upon in this context to write the very laws they must apply. The problems inherent in calling upon judges to fix the general rules of punishment are exacerbated still further where, as here, the judges are asked to write these rules in concert with commissioners selected by the executive branch. This collaborative rule-making effort between the judicial and executive branches of government casts too long a shadow over the independence and impartiality of the entire federal judiciary. And we can find in the Act no overriding need to justify so unprecedented an expansion of the mass of power conferred upon the judicial branch. Because this Court has concluded, with the greatest reluctance, that the Guidelines violate the basic principles of separation of powers, we do not reach the delegation of power and due process issues.[2]

I.

The eight criminal cases before us are at various stages of the adjudicative process. While all of the defendants have raised the issue of the constitutionality of the Guidelines, we find that only those defendants who have been found guilty and would be sentenced under the Guidelines present a ripe issue. Six of the defendants have been adjudicated guilty:

1. *United States v. Bogle,*
   *87–856–CR–MARCUS*

On November 18, 1987, Beverly Bogle was charged in a two-count indictment with the importation of at least five hundred grams of cocaine, and with possession with the intent to distribute at least five hundred grams of cocaine. 21 U.S.C. §§ 841(a)(1), 952(a). The offenses were committed at Miami International Airport, on November 11, 1987. Defendant Bogle pleaded guilty to the importation charge on January 11, 1988. The government agreed to dismiss the possession charge after sentencing.

2. *United States v. Eutsey,*
   *87–858–CR–KEHOE*

On November 18, 1987, a federal grand jury charged Marianne Eutsey with knowingly and intentionally importing at least five hundred grams of cocaine, and with possessing with the intent to distribute at least five hundred grams of cocaine. 21 U.S.C. §§ 841(a)(1), 952(a). The offenses were committed on November 12, 1987 at Miami International Airport. Defendant Eutsey was found guilty of both counts in a trial before a jury on January 3, 1988.

3. *United States v. Paul,*
   *87–855–CR–ARONOVITZ*

Marie D. Paul was charged by indictment on November 18, 1987, with the importation of a quantity of cocaine, and with possession with the intent to distribute the same quantity of cocaine. 21 U.S.C. §§ 841(a)(1), 952(a). On January 7, 1988, a jury returned a verdict of

---

**2.** Other courts have found the Guidelines unconstitutional on these bases. *See, e.g., United States v. Brodie,* 686 F.Supp. 941, 949–51 (D.D.

C.1988) (delegation of powers); *United States v. Frank,* 682 F.Supp. 815 (W.D.Pa.1988) (due process).

guilty on both counts against this defendant.

4. *United States v. Roberts,*
   *88–006–CR–RYSKAMP*

On January 7, 1988, Steven M. Roberts, James L. Roberts, and Harold Joseph Kelly were charged in an information with conspiracy to pass, utter, and keep in possession counterfeit Federal Reserve Notes. 18 U.S.C. §§ 371 and 472. On January 7, 1988, these three defendants waived indictment and entered pleas of guilty.

5. *United States v. Peoples,*
   *87–848–CR–KEHOE*

On November 13, 1987, a federal grand jury charged Yolanda Rogers Peoples with the importation of at least five hundred grams of cocaine, and with possession with the intent to distribute at least five hundred grams of cocaine. 21 U.S.C. §§ 841(a)(1), 952(a). The offenses occurred on November 5, 1987. On January 8, 1988, Defendant Peoples pleaded guilty to the importation charge. The government agreed to dismiss the possession count at sentencing.

6. *United States v. Gomez,*
   *87–964–CR–HASTINGS*

On December 16, 1987, Augusto Gomez was arrested, and on December 22, 1987 charged with the importation of at least five hundred grams of cocaine and with possession with the intent to distribute at least five hundred grams of cocaine. 21 U.S.C. §§ 841(a)(1), 952(a). Defendant Gomez pleaded guilty to the possession count on March 14, 1988. The government agreed to dismiss the importation charge at sentencing. Moreover, the government also agreed to recommend a two-level reduction in the Defendant's base offense level under the Guidelines, based upon the Defendant's acceptance of responsibility pursuant to section 3E1.1 of the Guidelines. The government further agreed to recommend a sentence at the lower end of the Guideline range applicable to the Defendant.

Two of the defendants have been charged with federal crimes but not convicted:

1. *United States v. Peña,*
   *88–14001–CR–DAVIS*

On February 16, 1988, Rafael Peña was charged in a three-count indictment with: conspiracy to import at least one hundred kilograms of marijuana; 21 U.S.C. §§ 952(a), 963; importation of at least one hundred kilograms of marijuana; 21 U.S.C. § 952(a); and distribution of at least one hundred kilograms of marijuana while on board an aircraft registered in the United States. 21 U.S.C. § 959(b)(1). The indictment alleges that the substantive acts occurred on February 3, 1988. Defendant Peña pleaded not guilty to all three counts on February 17, 1988, and demanded a jury trial.

2. *United States v. Fogel,*
   *88–8019–CR–DAVIS*

Alan Fogel and two other individuals were charged on November 13, 1987 in a three-count indictment with: conspiracy to import at least five kilograms of cocaine; 21 U.S.C. § 963; conspiracy to possess with intent to distribute in excess of five hundred grams of cocaine; 21 U.S.C. § 846; and possession with intent to distribute in excess of five hundred grams of cocaine. 21 U.S.C. § 841(a)(1). On March 2, 1988, Defendant Fogel was arraigned and pleaded not guilty to the charges alleged in the indictment.

The Constitution limits the power of the federal courts to the adjudication of "cases" or "controversies." U.S. Const. art. III, § 2. Accordingly, there has developed a number of corollary principles by which the courts ensure that the decision rendered is given effect through the resolution of an actual conflict and is not merely advisory. Rejection of an issue for want of ripeness means that the circumstances of the case have not advanced to the point of sufficient concreteness and specificity to justify review. The ripeness doctrine, then, prevents "the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagree-

ments...." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

■ The issue of the constitutionality of the Guidelines is ripe with respect to those defendants who have pleaded or have been found guilty: Bogle, Eutsey, Paul, Roberts, Peoples, and Gomez. Each of these defendants has a sufficient stake in the outcome of this controversy so as to assure "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *see also Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102, 143 & n. 29, 95 S.Ct.

335, 358 & n. 29, 42 L.Ed.2d 320 (1974). In each of these cases, based upon the recommendations of the Probation Department, each defendant would be subject under the Guidelines to an applicable sentencing range that would exceed the sentence for which they would be eligible under pre-Guidelines law.[3]

The same degree of concreteness does not exist as to Defendants Peña and Fogel. While both Peña and Fogel have been indicted, they have pleaded not guilty and have not been adjudicated guilty. That the Guidelines will be applied to these two defendants is not inevitable, but purely speculative. A jury could find Peña or Fogel not guilty; alternatively the government could fail to make out a *prima facie* case; or a

3. The United States Probation Office has recommended to the sentencing court in a Pre-sentence Report that Defendant Bogle be sentenced based upon a total offense level of 28. This determination was made based upon a base offense level of 26, increased by two points for obstructing justice. The sentence range under the Guidelines is 78–97 months, while the statutory minimum sentence for importation of five hundred grams of cocaine or more is five years. Thus, under the Guidelines, absent the sentencing court taking into account any mitigating factors, Defendant Bogle would be subject to a sentence of at least 18 months greater than the statutory minimum.

Defendant Eutsey's Pre-sentence Report indicates a base offense level of 26, with no adjustments. Thus, under the Guidelines, Defendant Eutsey would be subject to a minimum sentence of 63 months and a maximum sentence of 78 months. Therefore, under the Guidelines this defendant is subject to a sentence at least 3 months longer than the 5 year statutory minimum sentence.

According to the Pre-sentence Report, Defendant Paul's total offense level is 24. The base offense level is 24 and there have been no adjustments. The tentative findings issued by Judge Aronovitz, [Notice of Tentative Findings Pursuant to Section 6A1.3, March 15, 1988], rejected the Defendant's contention that she is eligible for a four point reduction because she was a "minimal" participant in the crime. Accordingly, the Guideline imprisonment range is 51 to 63 months. The statute provides for a penalty of up to 20 years. Since there is no statutory minimum sentence this defendant would have been eligible for a sentence below the Guideline range.

The Pre-sentence Report for Defendants Steven Roberts and Harold Kelly are virtually identical. Each has a total offense level of 11,

adjusted up 4 from the base offense of 9 for specific offense characteristics and reduced 2 for acceptance of responsibility. Hence, the sentence range under the Guidelines is 8 to 14 months. Since there is no statutory minimum sentence these defendants would have been eligible for a sentence below the Guidelines range.

Defendant James Roberts, according to his Pre-sentence Report, has a total offense level of 9, calculated by adding 4 points for the specific offense characteristics to a base offense level of 9, and subtracting 2 for the Defendant's role in the offense and 2 for acceptance of responsibility for the offense. Defendant James Roberts is in criminal history category III due to his 5 point criminal history calculation. Consequently, James Roberts is subject to a sentence range of 8 to 14 months under the Guidelines. Since there is no statutory minimum sentence this defendant would have been eligible for a sentence below the Guidelines range.

According to the Pre-sentence Report prepared concerning Defendant Peoples, her total offense level is 26, calculated by subtracting 2 points for acceptance of responsibility from the base offense level of 28. Accordingly, she would be subject to a sentence of 63 to 78 months under the Guidelines. Absent the Guidelines, Defendant Peoples could be sentenced to a minimum of 5 years and a maximum of 40 years. Therefore, under the Guidelines this defendant faces a sentence at least three months longer than the statutory minimum sentence.

The Pre-sentence Report prepared for Defendant Gomez shows a total offense level of 30, having a base offense level of 32 reduced by 2 points for acceptance of responsibility. The Guidelines produce a sentence range of 97 to 121 months. Therefore, under the Guidelines this defendant faces a sentence of at least 37 months longer than the statutory minimum sentence.

pre-trial motion could be granted entirely disposing of the outstanding charges. Thus, the motions of these defendants to declare the Guidelines unconstitutional are based upon " 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3332–38, 87 L.Ed.2d 409 (1985) (*quoting* 13A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3532, at 112 (1984)); *see also Poe v. Ullman,* 367 U.S. 497, 507, 81 S.Ct. 1752, 1758, 6 L.Ed.2d 989 (1961). *But see United States v. Ruiz–Villanueva,* 680 F.Supp. 1411 (S.D.Cal. 1988); *United States v. Arnold,* 678 F.Supp. 1463 (S.D.Cal.1988).

Defendant Peña contends, however, that the Guidelines affect him adversely at this stage because under the Guidelines there is substantial uncertainty as to the wisdom of negotiating a plea agreement. According to Peña, his counsel is unable to fully advise him whether to enter a guilty plea, cooperate with government investigations, participate in plea negotiations, or risk the uncertainties of a trial. We are unpersuaded by this argument. We can find no basis for the claim that the defendant is entitled to an advisory decision by this Court to assist him in making a decision about whether to accept a possible plea bargain. Insofar as the defendant faces a hardship from deferring a decision until the dispute has become concrete, that dilemma is no different from any other legal issue as to which a defendant might deisre but is not entitled in advance to a judicial determination.

Moreover, defendant Peña's argument somehow assumes that there was greater certainty in sentencing when judges had broader discretion, than under the formulae of the Guidelines. This is decidedly not the case. Rather, the Guidelines offer defendants much greater certainty and predictability in assessing their potential sentences. Under the Guidelines, a sentencing range is calculated by taking into consideration the offense, the defendant's role in the criminal activity, whether the defendant obstructed the proceedings, whether the defendant accepted responsibility, and the defendant's criminal history. Each factor is assigned a numerical value, dependent upon the factual circumstances particular to the offense. Then, based upon the Guidelines' matrix, a sentencing range is determined.

One of the goals of the Guidelines—to "provide certainty ... in meeting the purposes of sentencing...." 28 U.S.C. § 991(b)(1)(B)—has been achieved by severely restricting the discretion of the district court in meting out a sentence. *See United States v. Tolbert,* 682 F.Supp. 1517 (D.Kan.1988); *United States v. Frank,* 682 F.Supp. 815 (W.D.Pa.1988). Therefore, in view of the codified factors that necessarily determine the computation of a sentencing range under the Guidelines, a defendant may predict his or her potential sentencing range with far greater accuracy than under the pre-Guideline law.[4]

Finally, inasmuch as some of the cases presently before the Court are clearly in a posture ripe for decision, we believe the public interest would be served best by treating only those cases where the impact of the Guidelines are most concrete and immediate. Accordingly, we decline to render a decision as to the claims of Defendants Peña and Fogel.

---

**4.** The Guidelines also enable a defendant to predict more accurately the effect of entering a guilty plea or cooperating with the government. The Guidelines provide that a defendant who clearly accepts personal responsibility for his or her criminal conduct is entitled to a two-level reduction in the offense level. *Guidelines Manual* § 3E1.1(a), at 3.21. While pleading guilty does not automatically entitle a defendant to a sentence reduction, *id.,* at § 3E1.1(c), it may be a factor taken into consideration when determining acceptance of responsibility. *Id.* at Application Note 3. Pre–Guidelines, the defendant could only guess from what point a court would begin to adjust the sentence given the wide range of potential sentences. Also, when a defendant negotiates with the government to render substantial assistance, an agreement may be reached as to the recommendation of reduction in sentence the government will make. This is a significant factor for the court to take into account. *Id.,* § 5K1.1 & Application Notes 2–3, at 5.35.

## II.

The issues raised in this controversy go to the heart of American constitutional government and require an examination of principles fundamental to our polity. Of critical importance to this inquiry is the Framer's belief that the forms of political power must be separate for

> [t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many ... may justly be pronounced the very definition of tyranny.

*The Federalist No. 47,* at 301 (J. Madison) (C. Rossiter ed. 1961). The parties and *amici curiae* have disagreed as to these basic questions: first, upon which branch of government has the Act conferred power; and second, the nature of the power actually given to the Commission.

### A.

In essence the Act and the establishment of the Commission reposes both legislative and executive functions within the *judicial branch* by requiring it to create rules which effectively fix the level of punishment for the entire panoply of crimes contained in the federal criminal code. Moreover, the Act requires the collaboration of the judicial and executive branches in the formulation of fundamental policy decisions. It formally requires, by its express terms, the institutional involvement of the judiciary in appointing the Commissioners and developing and administering the Guidelines. The explicit language of the statute, the structure actually created, and ample legislative history manifestly establishes the extensive interaction between the judicial branch of government and this Commission. The judge/commissioners are selected and serve on the Commission precisely because they are federal judges, and their ongoing involvement squarely implicates the entire judiciary.

First, the Commission has been "established as an independent commission in the *judicial branch* of the United States...." 28 U.S.C. § 991(a) (emphasis added). This is a powerful indication that Congress intended the power of the Commission to reside with the judiciary and we are loathe to impose a contrary interpretation where Congress has made so patent an expression of its will. Moreover, the placement of the Commission in the judiciary is not a minor piece of draftsmanship, but rather an expression of Congress' view of the proper role of the judiciary. "Placement of the Commission in the judicial branch is based upon the Committee's strong feeling that, even under this legislation, sentencing should remain primarily a judicial function." S.Rep. No. 225, 98th Cong., 1st Sess. 159, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3342 [hereinafter S.Rep. 225].

Second, individual judges *as* judges are integrated into the procedures established by the Act. The Act requires that three of the seven voting members of the Commission "shall be federal judges." 28 U.S.C. § 991(a). That is, absent membership by at least three federal judges, the Commission could not function under the current legislation. In fact, all seven commissioners could theoretically be federal judges. This provision does not merely suggest participation by federal judges or contemplate that persons appointed by the President as Commissioners, may, in some circumstances, be federal judges. Instead, this legislation requires the participation of federal judges because of the fact that they are judges. Contentions that the judge/commissioners serve voluntarily are severely undercut by this provision. While the decision of an individual judge to serve ultimately may be a voluntary choice, three such "volunteers" must be recruited or the legislation would be rendered inoperative. This provision is another clear indication that Congress meant to delegate rulemaking authority to the judiciary. The Commission's seven voting members are appointed by the President, with the advice and consent of the Senate, and may be removed by the President "only for neglect of duty or malfeasance in office or for other good cause shown." 28 U.S.C. § 991(a). The Attorney General or his designee, as well as the Chairman of the United States Parole Commission, are ex officio, non-voting members of the Commis-

sion. We add that the Commission may act only by an affirmative vote of at least four voting members.[5]  28 U.S.C. § 994(a). Also, the fact that the commissioners may be removed by the President only for cause, indicates that they are not directly controlled by the executive, see Wiener v. United States, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958); Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), and lends support for the assertion that the judges remain in the judiciary, rather than function as members of the executive branch, even when acting as commissioners.

Individual judges also are implicated in this legislation in more subtle ways. All federal judges are required to submit to the Commission a written report on each sentence imposed.  28 U.S.C. § 994(w). Further, the salaries of the commissioners are tied directly to the salaries of judges of the United States Courts of Appeals. Accordingly, any district judge who is named to the Commission will receive an additional stipend for his efforts.  28 U.S.C. § 992(c).  Moreover, federal judges who serve as commissioners need not resign from their appointments as federal judges, but are relieved of their judicial duties during their tenures, id., and exempted from the residency requirement imposed by 28 U.S.C. sections 44(c) and 134(b).  28 U.S.C. § 992(d). The ongoing nature of the Commission is evident: the voting members are appointed for terms of no more than six years, and no member may serve more than two full terms.  28 U.S.C. § 992(a), (b).

Third, the Judicial Conference of the United States is required by the Act to perform a number of tasks critical to the operation and existence of the Commission. To begin with, the Conference is charged with the responsibility of recommending to the President for consideration a list of six judges from which three may be appointed. 28 U.S.C. § 991(a).  Quite intentionally the

judge/commissioners have not been severed from the judicial branch.

Earlier versions of the Act contemplated even further judicial involvement in the selection of Commissioners.  S.1437, 95th Cong., 1st Sess. (1977), introduced in the 95th Congress, proposed that of the seven Commissioners, four would be appointed by the President with the advice and consent of the Senate, while the other three would be judges, designated by the Judicial Conference.  Under that bill, the Commissioners were removeable by their respective appointing or designating authority. S.Rep. No. 605, 95th Cong., 1st Sess. 1159 (1977).  That bill also expressed the legislature's intent that judges be an integral part of the Commission.  As in the current Act, judges who serve as Commissioners need not resign their appointment as judges. Congress explained this provision by noting that the

> judge will remain in the judicial branch and will be engaged in activities closely related to traditional judicial activities, and that such a provision is necessary to assure that highly qualified candidates are not routinely excluded in practice because of the substantial burden of having to resign a lifetime appointment in order to serve a six-year term.

Id. at 1162.

In S.1722, 96th Cong., 2d Sess. (1980), offered in the 96th Congress, the Commission was to be composed of seven persons, four of whom would be appointed by the President with the advice and consent of the Senate.  The three judge/commissioners would be designated by the President from a list of ten candidates submitted by the Judicial Conference.  S.Rep. No. 553, 96th Cong., 2d Sess. 1229 (1980).  The rationale that the judge-appointees need not be confirmed by the Senate was based on the belief that there was no need to reconfirm a federal judge for service on the Commission because under the Act, the

---

**5.** The Guidelines were approved by the Commission by a vote of 6–1, with Commissioner Paul H. Robinson dissenting.  See Dissenting View of Commissioner Paul H. Robinson on the Promulgation of Sentencing Guidelines by the United

States Sentencing Commission (May 1, 1987). Accordingly, were the votes of the judge/commissioners to be discounted, the Guidelines would not have been approved by the requisite majority.

judge would not be required to resign. *Id.* at 1229 n. 3. Again, this indicates that Congress contemplated that the function of the judge/commissioner would overlap with the judicial functions so that reconfirmation would not be required for this "new" position.

H.R. 6012, 98th Cong., 2d Sess. (1984), introduced in the 98th Congress, contained the provision that the Guidelines would actually be prescribed by the Judicial Conference of the United States. The Congressional Report noted a number of reasons that made the Judicial Conference an appropriate body for such a function. First, the procedure for promulgating the Guidelines was analogized to other procedural rules of court such as the Federal Rules of Civil and Criminal Procedure. "Second, because judicial discretion in sentencing is a cornerstone of the criminal justice system, assigning the task of developing guidelines to the Judicial Conference is only logical. Judges who have had a strong voice in developing the guidelines will be more likely to consistently and fairly apply them." H.R.Rep. No. 1017, 98th Cong. 2d Sess. 94 (1984) (footnote omitted) [hereinafter H.R. Rep. 1017]. Congress also considered the resources available to the Conference through the Office of the United States Courts. "Equally important, to create an Executive branch agency or commission to promulgate the guidelines might not comport with the Constitution's separation of powers requirement." *Id.* at 94–95 (footnote omitted). Finally, Congress considered that the Judicial Conference would be able to provide continuity and new perspectives to the promulgation of the guidelines while remaining above the political fray. *Id.* at 95.

While, of course, the Judicial Conference under the Act does not promulgate the Guidelines, it does play an important role in choosing the Commissioners and providing information to the Commission. The rationale which sought to place the power to promulgate the Guidelines with the Judicial Conference is nonetheless instructive in demonstrating how the judiciary still is implicated under the present legislation. Formalized and institutional judicial involve-

ment in the crafting of the Guidelines always was considered crucial. Congress intended to model the legislation in such a way as to ensure the participation and cooperation of judges in the creation and administration of the Guidelines.

Under the Act, the Judicial Conference is required to submit to the Commission, at least annually, "a written report commenting on the operation of the Commission's guidelines, suggesting changes in the guidelines that appear to be warranted, and otherwise assessing the Commission's work." 28 U.S.C. § 994(*o*).

The Judicial Conference is the administrative arm of the federal judiciary, and is charged with the responsibility of

"mak[ing] a comprehensive survey of the condition of business in the courts of the United States.... It shall also submit suggestions and recommendations to the various courts to promote uniformity of management procedures and the expeditious conduct of court business.... [It may] hold hearings, take sworn testimony, issue subpoenas and subpoenas duces tecum, and make necessary and appropriate orders in the exercise of its authority.... All judicial officers and employees of the United States shall promptly carry into effect all orders of the Judicial Conference...."

28 U.S.C. § 331. It may not be maintained that the requirement placed upon the Judicial Conference by the Act is merely a convenient mechanism for choosing independent commissioners for the Commission. The Act requires the Judicial Conference to become intimately involved with the selection process. This requirement further indicates Congress' intent to place the imprimatur of the judiciary upon the Commission by involving that branch both institutionally through the Judicial Conference and individually by the cooperation of federal judges.

Extensive interaction between the judicial branch and the Commission is further evident in the legislative scheme. The Commission has been given the power to monitor the performance of, and issue in-

structions to probation officers concerning the application of the Guidelines and policy statements. 28 U.S.C. § 995(a)(9), (10). The Probation Office is an arm of the judiciary, properly subject to the authority of the judicial branch. Each district court has the sole authority to appoint and remove probation officers within the district. 18 U.S.C. § 3602(a). Judicial authority over probation, while limited to the district in which each probation office is located, is broad. *See United States v. Baker*, 429 F.2d 1344, 1347 (7th Cir.1970); *Kelly v. United States ex rel Frad*, 89 F.2d 866, 869 (2d Cir.), *aff'd sub nom. Frad v. Kelly*, 302 U.S. 312, 58 S.Ct. 188, 82 L.Ed. 282 (1937). The probation officer, in turn, owes his duties to the district court. Each probation officer must perform his duties in accordance with conditions set by the court, and must perform additional duties as specified by the court. 18 U.S.C. § 3603. Additionally, the Director of the Administrative Office of the United States Courts has the authority to oversee probation officers. The Director is empowered to investigate the work performed by probation officers, collect and publish information, report to the Judicial Conference, and fix salaries of probation officers. 18 U.S.C. § 3672. The power over probation is properly thought to be an administrative power of the courts. *Johnson v. Mishler*, 526 F.2d 364, 366 (2d Cir.1975); *United States v. Walker*, 491 F.2d 236, 238 n. 3 (9th Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974). Under the Act, the Commission's supervisory power over the probation officers necessarily implicates the judicial branch of government.

Finally, with respect to certain activities, the Commission "shall ... to the extent practicable, utilize existing resources of the Administrative Office of the United States Courts and the Federal Judicial Center for the purpose of avoiding unnecessary duplication." 28 U.S.C. § 995(b). In sum, we are constrained to conclude that the Sentencing Commission, in both function and form, has been woven into the fabric of the federal judiciary.

B.

As described by Senator Kennedy, a principal sponsor of the Act, this legislation is "the first comprehensive federal sentencing law and the most far reaching reform contained in the 23 chapters of the massive anti-crime package...." Kennedy, *The Sentencing Reform Act of 1984*, 32 Fed.B. News & J. 62, 62 (Feb.1985). He also commented that "the Criminal Code Reform Act ... constitutes the most important attempt in 200 years to reorganize and streamline the administration of Federal criminal justice." 123 Cong.Rec. 13066 (daily ed. May 2, 1977) (statement of Sen. Kennedy). This Act radically transforms the federal penal code, by effectively placing in the judicial branch the power to write the rules of punishment for all crimes. "The extraordinary powers and responsibilities vested in the Commission, ..." S.Rep. 225 at 160, 1984 U.S.Code Cong. & Admin.News p. 3343, confer upon it a power that is essentially legislative.

Section 994 of Title 28 of the United States Code details the broad duties of the Commission and creates the parameters by which the Guidelines must be devised. Congress continued the practice of setting maximum terms of imprisonment by statute, but decided "that the indeterminate sentence no longer has a role to play in the context of a guideline sentencing system," and "[a]ccordingly, all sentences to imprisonment under the new system are determinate." S.Rep. 225 at 115, 1984 U.S.Code Cong. & Admin.News p. 3298. Indisputably, the Act "delegates to the Commission broad authority to review and rationalize the federal sentencing process." United States Sentencing Commission, *Federal Sentencing Guidelines Manual* 1.1 (1988) [hereinafter *"Guidelines Manual"*]. Specifically, the Commission is empowered to promulgate Guidelines that are to be used to determine "whether to impose a sentence to probation, a fine, or a term of imprisonment," 28 U.S.C. § 994(a)(1)(A), as well as the length of such term and amount of an appropriate fine. 28 U.S.C. § 994(a)(1)(B). The Commission is also directed to determine whether a prison term should include "a requirement that the de-

fendant be placed on a term of supervised release after imprisonment, and, if so, the appropriate length of such a term," 28 U.S.C. § 994(a)(1)(C), and "whether multiple sentences to terms of imprisonment should be ordered to run concurrently or consecutively." 28 U.S.C. § 994(a)(1)(D). The Guidelines must establish a maximum sentencing range for each category of offense and defendant which cannot exceed the minimum range by more than the greater of 25 percent or six months, except if the minimum term is 30 years or more. 28 U.S.C. § 994(b).

Further, in establishing the Guidelines and policy statements, the Act provides specific criteria that shall be taken into account concerning the nature of the crime committed and of the defendant.[6] 28 U.S.C. § 994(c), (d). The Commission is empowered to determine how much weight, if any, to give to such generalized factors as the grade of the offense, the nature and degree of the harm caused by the offense, the community's view of the gravity of the offense, the public concern generated by the offense, the deterrent effect a particular sentence may have on the commission of the offense by others, and the current incidence of the offense in the community and in the Nation as a whole. 28 U.S.C. § 994(c). Also, the Commission is to "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed and socioeconomic status of offenders." 28 U.S.C. § 994(d)(11). Certain other factors are deemed inappropriate to consider in recommending a term of imprisonment. 28 U.S.C. § 994(e). Moreover, the Commission is charged with the responsibility of creating Guidelines that specifically take into account the available resources in penal and correctional facilities, as well as the responsibility of making recommendations concerning the utilization of such facilities.[7] Indeed the Guidelines are to be formulated so as "to minimize the likelihood that the Federal prison population will exceed the capacity of the federal prisons, as determined by the Commission." 28 U.S.C. § 994(g); *see also* 28 U.S.C. § 994(q)[8]. The Act also provides for specific consideration of the weight the Commission is to give certain other factors in determining the appropriate Guideline range. 28 U.S.C. § 994(h)–(n).

---

**6.** Title 28, U.S.C. § 994(d) requires the Commission to consider

whether the following matters, among others, with respect to a defendant, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall be taken into account only to the extent that they do have relevance—

   (1) age;
   (2) education;
   (3) vocational skills;
   (4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;
   (5) physical condition, including drug dependence;
   (6) previous employment record;
   (7) family ties and responsibilities;
   (8) community ties;
   (9) role in the offense;
   (10) criminal history; and
   (11) degree of dependence upon criminal activity for a livelihood.

**7.** Title 28, U.S.C. § 994(g) provides:

The Commission, in promulgating guidelines pursuant to subsection (a)(1) to meet the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code, shall take into account the nature and capacity of the penal, correctional, and other facilities and services available, and shall make recommendations concerning any change or expansion in the nature or capacity of such facilities and services that might become necessary as a result of the guidelines promulgated pursuant to the provisions of this chapter. The sentencing guidelines prescribed under this chapter shall be formulated to minimize the likelihood that the Federal prison population will exceed the capacity of the Federal prisons, as determined by the Commission.

**8.** Title 28, U.S.C. § 994(q) provides:

(q) The Commission and the Bureau of Prisons shall submit to Congress an analysis and recommendations concerning maximum utilization of resources to deal effectively with the Federal prison population. Such report shall be based upon consideration of a variety of alternatives, including—

   (1) modernization of existing facilities;
   (2) inmate classification and periodic review of such classification for use in placing inmates in the least restrictive facility necessary to ensure adequate security; and
   (3) use of existing Federal facilities, such as those currently within military jurisdiction.

**1134**

The extraordinary breadth of the Commission's discretion in ordaining punishment is further evident from the statutory instruction that "as a starting point in its development of the initial sets of guidelines for particular categories of cases, the Commission [shall] ascertain the average sentences imposed in such categories of cases prior to the creation of the Commission," but the Commission *"shall not be bound by such average sentences"*; rather it shall *"independently develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of title 18...."* 28 U.S.C. § 994(m) (emphasis added). Four very broadly based and often competing purposes are identified: (1) the sentence should reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the crime; (2) it should adequately deter criminal conduct; (3) it should "protect the public from further crimes of the defendant"; and (4) it should provide the defendant with needed educational and vocational training, medical care and correctional treatment. 18 U.S.C. § 3553(a)(2). In the main, Congress "deliberately [did] not show[ ] a preference for one purpose of sentencing over another in the belief that different purposes may play greater or lesser roles in sentencing for different types of offenses committed by different types of defendants." S.Rep. 225 at 77, 1984 U.S.Code Cong. & Admin. News p. 3260 (footnote omitted). That difficult task was conferred upon the Commission. The only apparent limitation imposed by Congress in the application of the general theories of penalty was "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a); *see also* 28 U.S.C. § 994(k).

Moreover, the Commission has been further empowered generally to promulgate policy statements and rules regarding the appropriate use of plea bargains and agreements, 28 U.S.C. § 994(a)(2)(E), although it has decided that the initial Guidelines would not make significant changes in current plea agreement practices. *Guidelines Manual* at 1.8.

The enabling legislation provides that the Commission's duties are to be continuous and its work evolutionary. The Act provides that the Commission review and revise the Guidelines based upon independent fact-finding, as well as through interaction with other departments of the Government. 28 U.S.C. § 994(*o*). The Commission may receive petitions from defendants challenging, based on changed circumstances, the general appropriateness of the Guidelines utilized in determining their sentences. 28 U.S.C. § 994(s)–(u). The Commission also is required to issue to Congress an analysis of sentences imposed under the Guidelines as well as any recommendation for future legislation. 28 U.S.C. § 994(w). Finally, as noted already, the Commission is granted the power to "monitor the performance of probation officers with regard to sentencing recommendations, ..." 28 U.S.C. § 995(a)(9), and to issue instructions to probation officers concerning the application of Guidelines and policy statements. 28 U.S.C. § 995(a)(10). Thus, the power conferred upon the Commission is fundamentally legislative. *See, e.g., United States v. Brodie*, 686 F.Supp. 941, 947 (D.D.C.1988); *United States v. Estrada*, 680 F.Supp. 1312, 1321–24 (D.Minn.1988).

C.

Throughout this country's history, our courts have agreed that the power to define crime and fix punishment belongs to the legislative branch of government. While from time to time Congress has employed various systems of determining the length of a sentence, *see generally United States v. Grayson*, 438 U.S. 41, 45–49, 98 S.Ct. 2610, 2613–15, 57 L.Ed.2d 582 (1978), it has remained indisputable, as Chief Justice Marshall wrote many years ago, that "the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95, 5 L.Ed. 37 (1820); *see also Hutto v. Davis*, 454 U.S. 370, 374, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982); *Rummel v. Estelle*, 445 U.S. 263, 274, 100

S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980); *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980); *United States v. Evans*, 333 U.S. 483, 486–87, 68 S.Ct. 634, 636, 92 L.Ed. 823 (1948); *Ex Parte United States*, 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916); *United States v. Hudson & Goodwin*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). Underlying this rule is the recognition that under the Constitution the legislature, as the branch of government most accountable to the people, must be entrusted with making these fundamental public policy decisions. "Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility *these are peculiarly questions of legislative policy.*" *Gore v. United States*, 357 U.S. 386, 393, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405 (1958) (citations omitted) (emphasis added). The Supreme Court further explained this view in a death penalty case. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Stewart, Powell, Stevens, JJ.). The Court reiterated that the specification of punishments involve "questions of legislative policy," *id.* at 176, 96 S.Ct. at 2926 (*quoting Gore, supra*) (other citations omitted), and noted that

> "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic, and social pressures."

*Id.* at 175, 96 S.Ct. at 2926 (*quoting Dennis v. United States*, 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951) (Frankfurter, J., concurring)).

The structural limitations of a judicially-created punishment scheme were outlined in *United States v. Evans, supra.* There, a defendant was indicted under a statute that made it illegal to bring into or land in the United States, or to conceal or harbor an illegal alien. The statute set a specific punishment based on the number of aliens imported, but failed to fix a punishment for concealing an alien. The indictment charged the defendant with concealing and harboring five aliens. The District Court dismissed the indictment because the statute did not provide for a punishment. The Supreme Court noted that the question presented was whether "the choice the Government asks us to make is so broad and so deep, resting among such equally tenable though inconsistent possibilities, that we have no business to make it at all." *Evans*, 333 U.S. at 486, 68 S.Ct. at 636. Affirming the District Court's decision, the Court held that revising the statute to provide a punishment was "a task outside the bounds of judicial interpretation." *Id.* at 495, 68 S.Ct. at 640. The Court further observed that

> defining crimes and fixing penalties are legislative, not judicial functions. But given some legislative edict, the margin between the necessary and proper judicial function of construing statutes and that of filling gaps so large that doing so becomes essentially legislative, is necessarily one of degree.

*Id.* at 486–87, 68 S.Ct. at 636 (footnote omitted).

Congress has given the federal courts discretion in fixing the length of a sentence within the confines of a legislative mandate. However, this had not always been the case. "In the early days of the Republic ... the period of incarceration was generally prescribed with specificity by the legislature." *Grayson*, 438 U.S. at 45, 98 S.Ct. at 2613. As theories of penology changed, the scheme of determinate sentencing gave way to a system of indeterminate sentencing whereby a judge could consider the circumstances surrounding a particular case "and, on that basis, ... select a sentence within a *range* defined by the legislature." *Id.* at 46, 98 S.Ct. at 2613 (citation omitted) (emphasis in the original). The discretion afforded the judge in fashioning a just sentence flowed directly from Congress' authority to create the levels of

punishment and delegate responsibility to impose the exact term to the judge consonant with his Article III power to decide a "case" or "controversy." But the basic

authority to define and fix the punishment for crime is legislative and includes the right in advance to bring within judicial discretion, for the purpose of executing the statute, elements of consideration which would be otherwise beyond the scope of judicial authority....

*Ex Parte United States*, 242 U.S. at 42, 37 S.Ct. at 74. Further, it must be noted in this regard that the power to permit probation or parole is derived from the legislative power. *Affronti v. United States*, 350 U.S. 79, 83, 76 S.Ct. 171, 173, 100 L.Ed. 162 (1955); *Lathen v. United States*, 259 F.2d 393, 397 (5th Cir.1958).

The decisions that the Commission has been asked to make in devising these Guidelines are so general and broad that the function must be viewed as essentially legislative. *See Evans*, 333 U.S. at 486–87, 68 S.Ct. at 636. An examination of the Guidelines as promulgated demonstrates this fact. The Guidelines reflect fundamental political and policy decisions which are derived from qualitative choices as to the type of punishment that is to be associated with specific crimes. These policy choices are made across the full range of federal crimes. For example, for defendants who are convicted of violation of antitrust laws, the Commission has concluded that "prison terms ... should be more common, and usually somewhat longer, than currently is typical.... The guideline imprisonment term represents a substantial change from present practice." *Guidelines Manual*, at 2.132–2.133. This represents an independent choice, unmistakably a basic policy determination, that the sentences which are currently being imposed on these defendants do not comport with the Commission's view of the gravity of the offense, not just that the sentences are generally unfair or disparate.

Another example of the broad legislative discretion exercised by the Commission is provided by the Guidelines promulgated for tax evasion. The Commission noted that

[r]oughly half of all tax evaders are now sentenced to probation without imprisonment, while the other half receives sentences that require them to serve an average prison term of twelve months. This guideline is intended to reduce disparity ... and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced. *The Commission believes that any additional costs of imprisonment that may be incurred as a result of the increase in the average term of imprisonment ... are inconsequential in relation to the potential increase in revenue.*

*Id.* at 2.140 (emphasis added). These "white-collar" examples simply illustrate the policy choices that the Commission is called upon to make. Decisions that result in increased punishment for particular offenses, and necessarily reflect considerations of deterrence and punishment, as well as the social impact of the crime and resource allocation, are integral to the process of developing the Guidelines and accordingly reflect a determination which is inherently legislative.

In creating the Guidelines, the Commission necessarily "attempted to reconcile the differing perceptions of the purposes of criminal punishment." *Id.* at 1.3. The Commission initially "sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that uses data estimating the existing sentencing system as a starting point." *Id.* at 1.4. Data drawn from 10,000 pre-sentence investigations were analyzed. But the Commission "has departed from the data at different points for various important reasons," *id.*, including the demonstrable observation that economic crimes were punished less severely than other equivalent behavior. As the Commission has itself observed, writing these Guidelines has required the resolution of "a host of important policy questions, typically involving rather evenly balanced sets of competing considerations." *Id.* at 1.5. Among the most important policy questions for the Commission to decide were these: (1)

whether to base sentences upon the actual conduct of the defendant regardless of the charges for which he was convicted (characterized as "real offense" sentencing), or upon the elements of the offense for which the defendant was convicted (characterized as "charge offense" sentencing), or finally whether some "hybrid" system ought to be adopted; *id.* at 1.5–1.6; (2) whether or not to promulgate significant changes in the current plea bargaining practices, a process which results in the disposition of "nearly ninety percent of all federal criminal cases"; *id.* at 1.8; (3) whether to write the Guidelines in such a manner as to classify as "serious" and therefore subject to mandatory prison terms, many offenses for which probation generally has been given [9]; *id.* at 1.9; (4) whether, and under what circumstances, to require that in sentencing defendants of multiple violations of law, that the counts will be made to run concurrently or consecutively; *id.;* and (5) whether to structure sentencing ranges and tables with many or few levels. *Id.* at 1.11.

The Commission has resolved many, although not all of these policy disputes, and without the unanimity of all of its voting members.[10] Undeniably the product of this Commission is an extraordinary effort to rationalize and synthesize divergent sentencing practice; equally clear to us is the conclusion that these Guidelines reflect a host of profound policy choices, directly affecting the punishment applicable in every federal criminal case and the size and shape of our penal institutions. We add that this Commission is established as a permanent agency and is charged with the continuing responsibility to modify and revise the Guidelines based on continued research and analysis. 28 U.S.C. § 994(*o*).

The Guidelines that have been promulgated by the Commission are so specific and exact that they will be applied in approximately 90 per cent of all the cases in the federal courts. *Guidelines Manual* at

1.12. The sentencing judge has the authority to deviate from the Guidelines only if an aggravating or mitigating factor is present in the case and has not been adequately incorporated into the Guidelines. The reasons for the departure must be stated. 18 U.S.C. § 3553(b). The application of these rules is fundamentally different from the discretion heretofore exercised by the judge in imposing a sentence because the Guidelines incorporate the individual circumstances surrounding the case, and create a narrowly prescribed range. The judge's discretion is thereby sharply constricted. The process of establishing the rules of punishment cannot simply be termed an adjunct function of deciding a case or controversy. *See infra* § IIIB. The Guidelines reflect prospective rulemaking and the decisions that guide the Commission's choices are divorced from the process of adjudication.

### III.

The Act violates the doctrine of separation of powers in that it has conferred unprecedented rule-making authority upon the judiciary that sweeps far beyond the case and controversy requirement of Article III; and it has created a Commission combining the power of the judiciary and the executive in such a manner as to plainly conflict with the functions of the courts under Article III. In the process, the Act has had the effect of drawing the least responsive branch of government into an ongoing series of controversial policy debates about crime and punishment.

### A.

■ Fundamental to any discussion of separation of powers is this basic premise:
The Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive and Judicial. *INS v. Chadha,* 462 U.S. 919, 951 [103 S.Ct. 2764, 2784, 77 L.Ed.2d 317] (1983).

---

**9.** "The Commission's view is that the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the

status quo where probation, not prison, is the norm." *Guidelines Manual,* at 1.9.

**10.** *See supra* note 5.

The declared purpose of separating and dividing the powers of government, of course, was to "diffus[e] power the better to serve liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 [72 S.Ct. 863, 870, 96 L.Ed. 1153] (1952) (Jackson, J., concurring).

*Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986). The diffusion and fragmentation of the power of the state into three distinct and separate branches of government, each with defined powers, stemmed from the conviction that,

[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.

*The Federalist No. 47*, at 301 (J. Madison). However, the manner and means by which this separation is to be maintained has generated controversy to this day. Clearly the branches of government were not meant to be hermetically sealed from each other and the necessity of some interdependence has long been recognized. *See, e.g., Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Youngstown Sheet & Tube, supra.*

The separation of powers became the definitive characteristic of American constitutional government. G. Wood, *The Creation of the American Republic, 1776–1787*, at 151 (1969). Where Montesquieu and Locke wrote lengthy treatises on the necessity of separating the exercise of governmental power into distinct units, Madison and the Framers sought to translate the theory into constitutional reality. Accordingly, "[t]he several departments of power are distributed and blended in such a manner as at once to destroy all symmetry and beauty of form, and to expose some of the essential parts of the edifice to the danger of being crushed by the disproportionate weight of the other parts." *The Federalist No. 47*, at 301 (J. Madison). The probability that any individual, group or department of government would dominate power was believed by the Framers to be sufficiently great as to require the creation of external checks on all officials and each department. As Madison explained:

[A] mere demarcation on parchment of the constitutional limits of the several departments is not a sufficient safeguard against those encroachments which lead to a tyrannical concentration of all the powers of government in the same hands.

*The Federalist No. 48*, at 313. Madison further stated:

To what expedient, then, shall we finally resort, for maintaining in practice the necessary partition of power among the several departments as laid down in the Constitution? The only answer that can be given is that as all these exterior provisions are found to be inadequate the defect must be supplied, by so contriving the interior structure of the government as that its several constituent parts may, by their mutual relations, be the means of keeping each in their proper places.... [T]he great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others ... Ambition must be made to counteract ambition.

*The Federalist No. 51*, at 320–22 (J. Madison). This premise still stands at the center of American constitutional government and the doctrine of separation of powers: it is only by extending the sphere of decision-making, and effectively fragmenting power, that we may hope to mitigate the abuses of power.

The aggregation of the legislative and judicial power in the same hands is as unwelcome today as it was when this nation was founded. As framed by Madison, "[w]ere the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for *the judge* would then be *the legislator*." *The Federalist No. 47*, at 303 (J. Madison) (emphasis in original). An underlying basis of the separation of powers doctrine, declared by the Framers and reit-

erated through the caselaw, is that "[i]t is impossible to keep the judges too distinct from every other avocation than that of expounding the laws." *The Federalist No. 73*, at 446–47 (A. Hamilton). Hamilton succinctly detailed the essence of the danger that might be encountered by the aggregation of these powers:

From a body which had had even a partial agency in passing bad laws we could rarely expect a disposition to temper and moderate them in the application. The same spirit which had operated in making them would be too apt to operate in interpreting them; still less could it be expected that men who had infringed the Constitution in the character of legislators would be disposed to repair the breach in the character of judges.

*The Federalist No. 81*, at 483 (A. Hamilton); *see also Buckley*, 424 U.S. at 123, 96 S.Ct. at 684 ("executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution."). The separation of powers "doctrine preserves the rule of law by requiring that people who make the law be different from the people who execute and apply it, which makes possible greater impartiality, uniformity and predictability in the application of sanctions." Note, *Separation of Powers and Judicial Service on Presidential Commissions*, U.Chi.L.Rev. 993, 1002 (1986).

The Framers considered and flatly rejected various proposals to require the judicial branch to participate directly in the legislative process. During the Constitutional Convention, it was proposed that federal judges associate with the executive to form a Council of Revision, which would pass on the validity of laws or exercise a veto. The rejection of this proposal was based on the fear that the proposed Council would grant excessive power to the least responsive branch of government,[11] and that such a consolidation would endanger the integrity

of the judiciary. *See* M. Farrand, *The Framing of the Constitution of the United States* 79, 119–20, 157 (1913); *The Federalist No. 73*, at 446–47 (A. Hamilton); *cf. Griswold v. Connecticut*, 381 U.S. 479, 513 n. 6, 85 S.Ct. 1678, 1698 n. 6, 14 L.Ed.2d 510 (1965) (Black, J., dissenting); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 649–50, 63 S.Ct. 1178, 1190, 87 L.Ed. 1628 (1943) (Frankfurter, J., dissenting); R. Berger, *Government by Judiciary* 300–06 (1977). In *The Federalist No. 73*, at 446 (A. Hamilton), Hamilton discussed the two great dangers from such a union with the executive:

One is that the judges, who are to be the interpreters of the law, might receive an improper bias from having given a previous opinion in their revisionary capacities; the other is that by being often associated with the executive, they might be induced to embark too far in the political views of that magistrate, and thus a dangerous combination might by degrees be cemented between the executive and judiciary departments.

Hamilton concluded that it was particularly dangerous to place judges "in a situation to be either corrupted or influenced by the executive." *Id.* at 447.

The history of the Council of Revision is instructive today inasmuch as the Commission also unites the judicial and executive branches. However, unlike the role of the Court in the Council of Revision, the Commission does more than revise or veto laws of Congress; it actually drafts the substantive rules of punishment. Thus, three basic concerns expressed by the Framers are raised by the creation of the Commission. First, the least accountable branch has played a substantial role in drafting the sentencing laws of this country. Second, judicial integrity is threatened by the required participation of judges on this Commission alongside members of the executive branch. Finally, judicial impartiality is

---

**11.** Such a combination of judicial and executive power was not a radical idea. The executive and judicial branches were viewed as historically associated. The constitution of New York contained such a council. In fact, Madison, himself, proposed and advocated the inclusion of a Council of Revision in the national constitution. He did not see it as a violation of separation of powers, but, rather, as an auxiliary precaution. G. Wood, *The Creation of the American Republic 1776–1787*, at 552 (1969).

compromised by having the judicial branch draft laws it will be called upon to interpret.

Article III of the Constitution defines and limits the judicial power: it shall extend to cases and controversies. *See, e.g., Muskrat v. United States,* 219 U.S. 346, 356, 31 S.Ct. 250, 253, 55 L.Ed. 246 (1911); *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821). As Hamilton explained, "[t]his constitutes the entire mass of the judicial authority of the Union." *The Federalist No. 80,* at 479 (A. Hamilton). The case-by-case adjudication of specific disputes provides the unique source of judicial power. As the Supreme Court has stated:

> [T]he judicial power of federal courts is constitutionally restricted to "cases" and "controversies".... [T]hose two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government. Embodied in the words "cases" and "controversies" are two complimentary, but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

*Flast v. Cohen,* 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949–50, 20 L.Ed.2d 947 (1968); *see also United States Parole Commission v. Geraghty,* 445 U.S. 388, 395–96, 100 S.Ct. 1202, 1208–09, 63 L.Ed.2d 479 (1980); *In Re Sealed Case,* 838 F.2d 476, 512 (D.C.Cir.), *prob. juris. noted sub nom. Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 1010, 98 L.Ed.2d 976 (1988). The case and controversy requirement defines the role of the judiciary and limits its power while preserving the delicate balance crafted by the Framers. *See Geraghty,* 445 U.S. at 396,

100 S.Ct. at 1209. The power of a judicial decree rests neither in the power of the purse nor the sword, but in the integrity of its source. The vigilance of the judiciary in confining the scope of its authority to the constitutional grant embodied in Article III is one aspect of the foundation of that power.

While none of the parties or *amici* contend that the creation of the Guidelines by the Commission constitutes the adjudication of a case or controversy and is therefore a power specifically granted the judiciary, the basic justiciability principles of standing, advisory opinions, and the political question doctrine illustrate the sharp distinction between adjudicating cases on the one hand, and codifying general and prospective rules of punishment on the other. These doctrines also serve to illustrate the importance of a separate and independent judiciary in our scheme of government.

Judicial power is by nature reactive and dependent upon the interests of litigants for presentation and illumination of the issues. *See GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.,* 445 U.S. 375, 382–83, 100 S.Ct. 1194, 1199, 63 L.Ed.2d 467 (1980). The courts are not empowered to seek issues or promulgate advice.

> This is in sharp contrast to the political processes in which the Congress can initiate inquiry and action, define issues and objectives, and exercise virtually unlimited power by way of hearings and reports, thus making a record for plenary consideration and solutions. The legislative function is inherently general rather than particular and is not intended to be responsive to adversaries asserting specific claims or interests peculiar to themselves.

*Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 221 n. 10, 94 S.Ct. 2925, 2932 n. 10, 41 L.Ed.2d 706 (1974). The standing doctrine, and the rule against rendering advisory opinions which incorporates the principles of mootness and ripeness, are standards by which a court may regulate the exercise of its power so

that the power is asserted only with regard to actual controversies. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 498–502, 95 S.Ct. 2197, 2205–07, 45 L.Ed.2d 343 (standing); *Preiser v. Newkirk,* 422 U.S. 395, 401–03, 95 S.Ct. 2330, 2334–35, 45 L.Ed.2d 272 (1975) (mootness); *Abbott Laboratories,* 387 U.S. at 148–49, 87 S.Ct. at 1515 (ripeness). These limitations represent both constitutional requirements as well as prudential considerations [12] that are aimed at restricting the power of the courts within proper boundaries and "preventing its intrusion on the prerogatives of the coordinate branches." L. Tribe, *American Constitutional Law,* § 3–7, at 67 (2d ed. 1988).[13] Only by retaining that separateness and exerting authority within the context of cases presented can courts effectively offer protection from abuses of power and avoid becoming "the organ of political theories." *United Public Workers v. Mitchell,* 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). By calling upon the judges to discharge tasks other than deciding cases and controversies, the Act involves judges " 'too intimately in the process of policy and thereby weaken[s] confidence in the disinterestedness of their judicatory functions.' " *In Re Sealed Case,* 838 F.2d at 512 (quoting F. Frankfurter, *Advisory Opinions,* in 1 *Encyclopedia of the Social Sciences* 475, 478 (1930)) (other citation omitted).

### B.

Indisputably, the judicial power of the federal courts extends only to the adjudication of cases and controversies. Equally beyond debate is the recognition that the federal courts must " 'carefully abstain from exercising any power that is not strictly judicial in its character, and which is not clearly confided to [them] by the Constitution.' " *Muskrat,* 219 U.S. at 355, 31 S.Ct. at 253 (*quoting Gordon v. United States,* 117 U.S. 697, 706 (1864)). Further, it is settled, as the Commission as *amicus curiae* has observed, that Congress has the power to create necessary and proper supportive and auxiliary institutions to aid in the performance of that branch's central functions.

From this observation, the Commission has drawn the basic argument that its placement in the judicial branch is proper because the delegation of power to create the rules of punishment "is in aid of, and reasonably related to, the operation of that branch—its administration, its procedures, its internal governance, and its Article III adjudicative duties and authority." [Commission Brief at 40]. Citing what it has characterized as consistent "precedent and tradition," *id.,* the Commission contends that the Guidelines are designed "solely to assist federal judges in pronouncing and imposing sentence," *id.,* and that the Commission's task is simply "to rationalize the

---

**12.** Without such [prudential] limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.
*Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (*citing Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 222, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974)) (footnote omitted).

**13.** The political question doctrine perhaps most clearly embodies this concept of judicial separateness.
    The non-justiciability of a political question is founded primarily on the doctrine of separation of powers and the policy of judicial self-

restraint. The relationship between the judiciary and other branches of the federal government give rise to the political question, and whether a matter has been committed by the Constitution to another branch of Government is decided by the Court.
C. Wright, *Law of Federal Courts* § 14, at 75 (4th ed. 1983) (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 164–166, 2 L.Ed. 60 (1803)). The classic political question formulation enunciated in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), again reflects constitutional requirements as well as prudential and functional concerns. Of primary import, for our inquiry, is that courts may determine a case non-justiciable if it involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" *id.,* at 217, 82 S.Ct. at 710; or if a court determines "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion." *Id.*

sentencing process and guide the discretion of judges so as to avoid sentencing disparities and satisfy the purposes of sentencing." *Id.* at 41. These functions, it claims, are closely tied to the judicial process for *administering* remedy and redress, and must be distinguished from the promulgation of rules that create rights and obligations binding upon the general public. In sum, the Act has accomplished no more, the Commission concludes, than Congress did when it delegated to the courts, in the Rules Enabling Act of 1934, the power to prescribe by general rules the practice and procedure of the district courts and the courts of appeals in civil action; or when it conferred upon the courts the power to promulgate rules of criminal procedure, or rules of evidence; or, finally, in creating within the judiciary such ancillary non-adjudicative bodies as the Administrative Office of the United States Courts, the Judicial Conference, or a federal probation service. Because we believe that the Guidelines are broadly based and binding substantive rules radically different in nature from the rules of practice and procedure, we are not persuaded by the argument that the Act is simply another auxiliary mechanism by which the courts may be governed and administered.

We are not prepared to accept the contention that the Guidelines are designed and intended, in the main, to facilitate the efficient functioning of our courts. The Act does far more than direct the manner in which material relevant at sentence may be filed and presented to the courts, or the form by which a judge may pronounce a sentence. The basic distinction between imposing a sentence in a particular case and promulgating binding, plenary rules is the difference between a judicial and legislative function.

A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation on the other hand looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power.

*Keller v. Potomac Electric Power Co.,* 261 U.S. 428, 440–41, 43 S.Ct. 445, 448, 67 L.Ed. 731 (1923). These Guidelines ordain and fix punishment for all federal crimes. This sweeping rule-making function does not only "assist" and "channel" the sentencing judge in carrying out his adjudicatory tasks. Far more important, the Guidelines are designed expressly to regulate the conduct of the public, and like all criminal statutes, seek to proscribe wrongful conduct—by implementing distinct policy choices that reflect, *inter alia,* the seriousness of the crime committed, the general purposes of deterrence and punishment, and the role of the defendant. We are hard-pressed to find a law more practically substantive than one which effectively determines how long an individual will be incarcerated or whether probation will be eliminated as an alternative to imprisonment, or how great a fine the law may exact as a penalty. Indeed, the act of promulgating rules of punishment is by nature as substantive as the act of labeling conduct criminal. Both sets of rules are general, binding and prospective; both sets are designed to proscribe wrongful behavior; and both require the maker to choose from among fundamental and often competing theories of penology.

Some guidance is found in the recently decided case of *Miller v. Florida,* —— U.S. ——, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). In that case the Supreme Court examined whether the application of Florida's sentencing guidelines violated the Ex Post Facto clause. Generally, "no *ex post facto* violation occurs if a change in the law does not alter 'substantial personal rights,' but merely changes 'modes of procedure which do not affect matters of substance.'" *Id.* at 2451 (quoting *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed. 2d 344 (1977)) (other citation omitted). In determining that the Florida sentencing guidelines were not procedural, a unanimous Court expressly rejected the claim that the guidelines merely channeled the exercise of the judge's discretion, and found that they actually did affect the defendant's substantive rights. Central to

this determination was the Court's conclusion that the sentencing guidelines increased the defendant's punishment as well as affected the possibility of appellate review. "[A] change in the law that alters a substantial right can be *ex post facto*," the Court wrote, " 'even if the statute takes a seemingly procedural form.' " *Id.* at 2453 (quoting *Weaver v. Graham*, 450 U.S. 24, 29 n. 12, 101 S.Ct. 960, 31 n. 12, 67 L.Ed.2d 17 (1981)). While *Miller* presented no separation of powers questions, the clear import of the Court's holding is that the application of sentencing guidelines implies more than a mere alteration in the procedure by which a convicted defendant is sentenced.

Moreover, the authority to fix punishment for violation of every statute in the federal criminal code is substantially different from the powers exercised by the courts to ensure compliance with its own procedural rules. The Commission, as *amicus curiae*, contends that the Guidelines merely "channel" the remedial discretion of the judge in imposing sentence and that the Guidelines are analogous to a statute that would guide the judge's discretion in imposing a sanction under Federal Rule of Civil Procedure 11, or in awarding a "reasonable" attorney's fee to a prevailing party. We find this argument unpersuasive also. Rule 11 provides a mechanism whereby the courts can deter litigation conducted in bad faith and is meant to "streamline the litigation process by lessening frivolous claims or defenses." Fed.R. Civ.P. 11 Advisory Committee Note. Clearly the rule is meant to further the efficient administration of the courts and is directed solely to ensure that procedural requirements are followed. The sanctions are meant to function as a means to affect the behavior of litigants *during* the course of an action. Fixing the level of punishment for the violation of federal statutes does not simply affect how parties will behave once in court, but also affects substantive rights, and serves to constrain conduct outside of the sphere of the courts. The central premise of the court's disciplinary powers is that its "ability to punish disobedience to judicial orders is regarded as essential in ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other branches." *Young v. United States ex rel Vuitton Et Fils S.A.*, —— U.S. ——, 107 S.Ct. 2124, 2131, 95 L.Ed.2d 740 (1987). The enforcement mechanism serves to foster the efficient administration of judicial resources, as well as further maintain judicial independence in asserting its authority to decide a case or controversy. In short, Rule 11 is not comparable to the Act in its purpose or its scope.

The Commission also relies heavily on the delegated rulemaking authority to regulate the practice and procedure of the federal courts. The Supreme Court has been given broad authority to promulgate rules as to the conduct of its business, 28 U.S.C. § 2071, the Rules of Civil Procedure, 28 U.S.C. § 2072, and the Rules of Evidence. 28 U.S.C. § 2076. The Commission contends that in promulgating the Guidelines it is engaged in an analogous type of rulemaking.

The Rules Enabling Act of 1934, which gave the Court the power to promulgate the Federal Rules of Civil Procedure, specifically provided that "such rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072. The concern at the time this Act was passed was that federal courts sitting in diversity should be required to apply state substantive law and federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S.Ct. 1136, 1140–41, 14 L.Ed.2d 8 (1965). The Court, therefore, was required to delineate this distinction.

The test must be whether a rule really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.

*Sibbach v. Wilson*, 312 U.S. 1, 14, 61 S.Ct. 422, 426, 85 L.Ed. 479 (1941); *see also McCollum Aviation, Inc. v. CIM Associates, Inc.*, 438 F.Supp. 245, 248 (S.D.Fla. 1977) ("When a rule of law is one which would affect a person's conduct prior to the onset of litigation and has no design to manage ongoing litigation, it is a rule of

substance rather than procedure."). While the rules of procedure surely affect substantive rights, their clear purpose is to create a uniform practice throughout the federal court system and are designed to provide guidance to the parties upon entering the judicial system. The Federal Rules of Civil Procedure, for example, trace the history of a civil law suit from filing the complaint, Fed.R.Civ.P. 3, to efforts to enforce a judgment. Fed.R.Civ.P. 62. Thus, these rules may best be seen as structuring how the party gets into the district court, what happens once there, and how to get out. *See also* 28 U.S.C. § 2075.

Nonetheless, the Commission contends that the substantive/procedural concern evinced by Congress in delegating procedural rulemaking authority was not grounded in the separation of powers doctrine, but in federalism. It notes that *Sibbach* merely interprets the Rules Enabling Act of 1934 and does not set forth a constitutional basis for the substantive/procedural dichotomy. The Commission's analysis ignores the fact that the language of the Rules Enabling Act was drafted generally and was not limited to diversity cases. Thus, under the Enabling Act, the Supreme Court cannot alter substantive rights, whether federal or state. *See United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). Moreover, the concepts underlying federalism are not inconsistent with separation of powers concerns, but likewise seek to diffuse power. We can see no reason why the substantive/procedural distinction may be deemed a dispositive means for limiting federal power, in relation to the states, yet may be considered unimportant in an analysis of the relationship of the branches of the federal government. Such a limited view ignores the overarching scheme which seeks to place the authority to create substantive laws with the states and Congress. Broad-based substantive rulemaking, we think, still remains within the general province of Congress.

■ While federalism may have been the basic concern in both the promulgation of the enabling legislation and in the *Sibbach*

decision, the application of the Commission's premise here leads to the unacceptable conclusion that the separation of powers doctrine would tolerate a delegation of power to the judiciary to create rules which have the effect of defining the substantive elements of criminal conduct. If the substantive/procedural distinction is without any meaning for separation of powers analysis, such rulemaking could also be deemed legitimate as an "aid" to the judicial function of adjudicating guilt. We are unprepared to adopt so unrestrained a view of the courts' rulemaking authority. Concededly, the courts have long struggled in many contexts with drawing these distinctions. Wherever that line may be, we are convinced that in this context the Guidelines clearly fall on the side of invalid, substantive rulemaking, not because of the wisdom of the Guidelines—a matter surely falling within the prerogative of the legislative branch—but rather because the judicial branch has played so large a role in their creation.

We add that the codification of the Federal Rules of Evidence offers little support for the Commission's basic contention. The Supreme Court originally promulgated the Rules of Evidence on November 20, 1972 pursuant to its authority to issue rules of court. 18 U.S.C. §§ 3402, 3771, 3772; 28 U.S.C. §§ 2072, 2075. The Rules were to take effect on July 1, 1973; and as with the Guidelines, no subsequent affirmative Congressional action was required. But, Congress was concerned that the Rules of Evidence affected the substantive rights of litigants and express approval was required. Therefore legislation was enacted which provided that the Rules of Evidence as promulgated by the Supreme Court would "have no force or effect except to the extent, and with such amendments, as they may be *expressly* approved by Act of Congress." Act approved March 30, 1973, Pub.L. 93–12, 87 Stat. 9 (1973) (emphasis added); *see also*, Act approved Jan. 2, 1975, Pub.L. 93–595, 88 Stat. 1926 (1975) (enacting Federal Rules of Evidence).

Also, specific enabling legislation was enacted for future amendments of the Rules

of Evidence. 28 U.S.C. § 2076. The House Judiciary Committee Report noted that

[m]any of the Rules of Evidence, particularly in the privilege and hearsay fields, involve substantive policy judgments as to which it is appropriate that the Congress play a greater role than that provided for in the present Enabling Acts.

H.R.Rep. No. 650, 93d Cong., 1st Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News, 7051, 7075, 7091. The resulting statute permitted the Supreme Court to prescribe amendments to the Rules of Evidence. However, Congress could disapprove any particular rule promulgated; the waiting period to allow Congressional action before the amendments became effective was extended from 90 to 180 days; either House of Congress could prevent any amendment from becoming operative; and Congress specifically reserved the right to amend the rules. Further, "[a]ny ... amendment creating, abolishing, or modifying a privilege shall have no force or effect unless it shall be approved by an act of Congress." 28 U.S.C. § 2076; *see also* S.Rep. No. 1277, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News, 7051, 7069–70.

The Act confers upon the judiciary broad powers to affect the substantive rights of litigants. While generally, the Rules of Evidence govern what can and cannot be used as evidence in a courtroom, the Guidelines reach far beyond what happens in court. The promulgation of the Guidelines cannot be viewed simply as an adjunct to the adjudication of cases and controversies, or the administration of courtroom procedures. The continuing power of the Supreme Court to promulgate amendments to the Rules of Evidence is circumscribed, and as contrasted with the Act, does not call upon the judiciary to join with the executive in determining matters of significant social policy.

Finally, the Commission has broadly cited to the authority conferred upon the judiciary by Congress to facilitate the administration of the business of the courts. As early as the passage of the Judiciary Act of 1789, Congress gave the courts the power to appoint clerks. Since that time, Congress also has created within the judicial branch other entities to assist the administration of the courts. The Administrative Office of the United States Court, the Federal Judicial Center, United States Probation Department and the Judicial Conference of the United States are vested with administrative powers including, in some instances, the ability to promulgate rules to further efficient administration. Such rulemaking delegations have been upheld as necessary "for the effective and expeditious administration of the business of the courts...." *Chandler v. Judicial Council of Tenth Circuit of United States,* 398 U.S. 74, 86 n. 7, 90 S.Ct. 1648, 1655 n. 7, 26 L.Ed.2d 100 (1970); *see also Matter of Certain Complaints Under Investigation,* 783 F.2d 1488, 1503–05 (11th Cir.) (judges may participate in ancillary court management tasks), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986). However, we can find no examples of substantive rulemaking by these entities.

The Administrative Office of the United States Courts is empowered to prepare budget estimates for the courts; 28 U.S.C. § 605; fix the compensation of all court staff; pay the expenses of the courts; acquire all needed supplies and books; and provide accommodations for the courts. 28 U.S.C. § 604. The Federal Judicial Center is to provide assistance and staffing for the Judicial Conference; develop programs of continuing education and training for judicial personnel; and develop recommendations for improvement of the administration and management of the courts. 28 U.S.C. § 620. The Judicial Conference of the United States is to survey the business of the courts; plan for the assignment of judges; and make other such recommendations. 28 U.S.C. § 331. None of these tasks, however, remotely approaches in substance the enactment of rules of punishment.

### C.

We have concluded that the Act expressly confers rulemaking power upon the judicial branch of government; that the power to fix punishment for all federal crimes is

fundamentally legislative in nature; and that this substantive rulemaking function cannot merely be characterized as being "in aid of" or "reasonably related to" the judiciary's administration or internal governance, or to the court's ability to adjudicate cases and controversies.

■ A fair and thorough review of the few cases that have considered the extent to which the judiciary may exercise powers traditionally associated with the coordinate branches discloses the unprecedented power conferred by this Act. Equally apparent in these cases is the abiding concern expressed by those courts, and shared by this one, that the independence and impartiality of the judiciary is of primary importance. Accordingly, we conclude that, under the Act, the sweeping power exercised by the judiciary in concert with the executive branch undermines the court's prescribed mission of adjudicating cases and controversies.

Two cases decided early in our nation's history demonstrate that the authority granted a judge by an Act of Congress cannot serve to alter the fundamental power of the courts to provide the final resolution to cases and controversies. In *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792), Congress had passed a statute which gave the Circuit Courts the power to settle the claims, arising out of the Revolutionary War, of widows and orphans and to regulate the claims of invalid pensions. Facially, this task would appear to be no more than the classical adjudication of a case or controversy. However, under the statute, the judicial decisions were subject to review first by the Secretary of War and then by Congress. While the law was repealed before the Supreme Court ruled on this question, the circuit courts for the Districts of New York, Pennsylvania, and North Carolina [14], with five Supreme Court Justices sitting,[15] had concluded prior to its repeal that the Act "violated the separation of powers by requiring of judicial officers the performance of a task which formed no part of the courts' Article III powers, and by subjecting judgments rendered by members of the judicial branch to revision by officials of the legislative or executive branch." *In re Application of President's Commission on Organized Crime, Subpoena of Scaduto*, 763 F.2d 1191, 1196 (11th Cir.1985). The courts concluded that the Act appointed Commissioners to hear the claims based on official rather than personal designation and therefore invoked the federal judicial power. The Circuit Court for the District of New York noted that "neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner." *Hayburn's Case*, 2 U.S. at 410 n. (a).

In the case of *United States v. Todd*, 54 U.S. (13 How.) 52, 14 L.Ed. 47 (1794), the Supreme Court determined that the Act of 1792, at issue in *Hayburn*'s case, could not confer the power of Commissioner upon the circuit judges. The court below, sitting in the District of Connecticut,[16] had proceeded as Commissioners and found that Todd was entitled to be placed on the pension list and paid accordingly. The Supreme Court unanimously ruled "that the power given in the act of 1792 to the Circuit Court as a court, could not be construed to give it to the judges out of court as commissioners." *Id.* at 53. Again, the Court was not presented squarely with the question of whether a judge could exercise the power of Commissioner if individually appointed. However, these decisions stand for the proposition that the courts cannot be granted powers which subvert their ultimate authority to decide cases and controversies.

Pertinent to our analysis here, is the conclusion in these cases that non-judicial

14. The District of North Carolina conceded that no application was pending before it. *See* D. Currie, *The Constitution in the Supreme Court* 6–10 (1985).

15. Chief Justice Jay and Justice Cushing: District of New York; Justices Wilson and Blair: District of Pennsylvania; and Justice Iredell: District of North Carolina.

16. Again with Chief Justice Jay and Justice Cushing sitting.

review of the court's decision affects both the institutional power of the court, as well as the individual status of the judges called upon to make the preliminary interpretation. Review by Congress and the Executive, in essence, required the court to render merely an advisory opinion. Moreover, by requiring the judges to perform an essentially executive function, the statute can be conceptually viewed as lifting the judge out of his Article III role for the purpose of adjudicating th: pension claims, and resting Article II , owers with that official. While the constitutional problems of having legislative and executive review of a judicial decision appear obvious inasmuch as such a scheme clearly eviscerates the·independence of the judiciary, these cases also highlight that the conduct of individual judges may likewise implicate independence concerns.[17]

The principle of *Hayburn's Case* was applied by the Supreme Court in *United States v. Ferreira*, 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1851), a case cited by all parties as bearing directly on the issues of this case. There the Court considered whether Congress could assign to an Article III court the duty to receive and adjust claims against the United States pursuant to the Treaty of 1819 with Spain. Under that statute, however, the final determination of payment rested with the Secretary of the Treasury. The Court concluded that it did not have jurisdiction to hear an appeal from the District Court brought by the District Attorney of the United States. Since the decision was reviewable by the Secretary of the Treasury "[t]he decision is not the judgment of a court of justice. It is the award of a commissioner," *id.*, at 47, and an appeal to the Supreme Court accordingly was improper. The Court in dicta distinguished the statute at issue from the statute addressed in *Hayburn's* case, observing that in *Ferreira*, the Act imposed a duty "personally" on the individuals who served as judges and not on the

Court *eo nomine.* *Ferreira*, 54 U.S. at 49–51.

Arguably in *Ferreira*, the district judge while acting as "commissioner" had no tie to the judiciary. However, the application of even that distinction—between the authority conferred upon a judge and upon a court—to this case would not "save" the constitutionality of the Commission, because as discussed · *supra* § IIA, the judges/commissioners are simply not appointed as independent commissioners severed from their judicial mooring, but rather retain their involvement with the judiciary and indeed are appointed precisely because they are judges. Moreover, the judicial branch is directly implicated by the Act's structure and stated purpose. Finally, we observe that the Act has conferred upon the judiciary ongoing and broadly substantive rulemaking authority vastly different from a delegation to adjust claims, case-by-case, under a treaty.

Within certain narrowly limited circumstances the delegation of non-Article III appointment power on the courts *eo nomine* has been upheld. An examination of these cases, relied upon by the Commission, underscores the narrow limits of that delegation, and by contrast discloses the unexampled delegation conferred by the Act. In *Ex parte Siebold*, 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1879), the Court reviewed a federal statute which provided, *inter alia*, that "[t]he judge [of the Circuit Court of the United States] shall appoint two supervisors of election for every election district in such city or town [having upwards of twenty thousand inhabitants]." *Id.* at 379. The petitioner objected to the act, claiming, *inter alia*, that it imposed on "the Circuit Court duties not judicial...." *Id.* at 397. The Court found that the appointment power was properly conferred.

> [T]he duty to appoint inferior officers, when required thereto by law, is a constitutional duty of the courts; and in the present case there is no such incongruity

---

17. "The separation of powers was meant to ensure that different people would staff the three branches in order to protect against the concentration of power in the same hands. This danger is present whether a judge performs a non-

judicial government duty as an individual or as a court." Comment, *Separation of Powers and Judicial Service on Presidential Commissions*, 53 U.Chi.L.Rev. 993, 1009 (1986) (footnote omitted).

in the duty required as to excuse the courts from its performance, or to render their acts void. It cannot be affirmed that the appointment of the officers in question could, with any greater propriety, and certainly not with equal regard to convenience, have been assigned to any other depository of official power capable of exercising it. Neither the President, nor any head of department, could have been equally competent to the task. *Id.* at 398.

The exception to classic Article III powers carved by the *Siebold* Court rests on a balancing approach which uses as its fulcrum a concern for the traditional role of the judiciary. The "incongruity limitation" by definition requires an examination of the function assigned to a court. In *Siebold,* the Court concluded that the *appointment* of election supervisors pursuant to a Congressional delegation was not inconsistent with the Appointment Power, U.S. Const. art. II, § 2, cl. 2, and not in direct conflict with either its other duties or the authority committed to the executive branch.

Similarly, in *Hobson v. Hansen,* 265 F.Supp. 902 (D.D.C.1967), a three-judge court found constitutional legislation empowering the district court to *appoint* members of the District of Columbia School Board. The court relied on *Siebold,* as well as on its authority as an Article I court, in reaching this determination. The court, however, did note the general limitations upon the duties judges may be called upon to perform. These limitations are based upon: policy or propriety, the *Siebold* incongruity limitation, as well as the requirement that the authority exercised be consistent with the "guaranties of personal liberty." *Hobson,* 265 F.Supp. at 915 (*quoting O'Donoghue v. United States,* 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933)). The majority found that the appointment power conferred by Congress offended none of these considerations stating, *inter alia,* that "[t]he 'incongruity' problem is solved for the District of Colum-

bia in the present case by the express grant to Congress to invest even Article III courts with authority to appoint 'inferior officers'...." *Id.*[18]

The distinction drawn in *Hobson* was basically between the power to appoint and the power to administer and supervise. "Appointment is a one time only task, and does not require the appointing body to supervise or otherwise become entangled in the activities of the appointed official." *In re Sealed Case,* 838 F.2d at 512. This difference alone suggests some functions that a judge may properly perform in a "non-judicial" capacity, and those from which it would be impossible to effectively remove the judicial mantle. *Siebold* and *Hanson,* then, are notable for the limitations they impose upon the exercise of nonjudicial power, and for their striking contrast with the case at bar.

■ First, the instant case does not rest upon the *appointment* power of the Court, and different separation of powers considerations are implicated when the power conferred is legislative or executive. Second, the power conferred upon the Commission is incongruent with the authority vested in the federal courts to decide cases and controversies. The authority to create a scheme that fixes the level of punishment for all violations of the federal penal code is a particularly broad legislative function and would be vested "with greater propriety" in another branch. Unlike the appointment of an election commissioner or a member of the board of education, the power to fix punishment requires the courts to promulgate the Guidelines, and write the very laws they must interpret and apply in every criminal case. Moreover, this Act, unlike the delegation of appointment power, requires the rulemaking function to be exercised in collaboration with the executive branch. In short, the operation of the Commission requires the thorough integration of the federal judiciary with the political branches of government. It is

---

**18.** Judge Skelly Wright suggested in dissent in *Hobson* that "[t]o let constitutionality turn on the fact that Congress said 'judges' rather than 'court' would attach critical significance to a trivial detail of draftsmanship." *Hobson v. Hansen,* 265 F.Supp. 902, 925 (D.D.C.1967).

wholly unlike the delegation of a unique and discrete appointment power.

Two recent cases arising out of the activities of the President's Commission on Organized Crime are instructive here, and underscore the requirement that the judiciary must remain independent, impartial and removed from the political arena. Two judges—Second Circuit Court of Appeals Judge Irving Kaufman, and retired Supreme Court Justice Potter Stewart—served on this Presidential Commission which was charged with the task of completing a study and analysis of the nature and extent of organized crime in America and making appropriate recommendations. In both cases, the powers of the Commission were challenged based upon, *inter alia,* separation of powers grounds. These cases, heard by the Eleventh and Third Circuits, resulted in inconsistent determinations, although both courts employed essentially the same method of analysis. The Eleventh Circuit in *Scaduto, supra,* found that the Commission as constituted did violate the separation of powers doctrine, while the Third Circuit in *In the Matter of President's Commission on Organized Crime, Subpoena of Scarfo,* 783 F.2d 370 (3d Cir.1986), came to the opposite conclusion.

In *Scaduto, supra,* the Eleventh Circuit found that membership by judges on the Commission threatened the impartiality requirement of "the federal judicial office," because the activities of the Commission as well as the information uncovered would foster a "pro-government" perspective. *Scaduto,* 763 F.2d at 1197. "Impartiality," the court observed, "is one of the central, constitutionally-ordained, requirements of the federal judicial office, and this impartiality [was] threatened by ... the Commission's activities." *Id.* The basic question for resolution was whether the imposition of powers traditionally associated with the executive branch on officials of the judicial branch would interfere with the ability of the judicial branch to perform its constitutionally required duties. In framing the question, the Eleventh Circuit employed the "impairment of function standard"

enunciated by the Supreme Court in *Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (*Nixon II*) and *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 5090, 41 L.Ed.2d 1039 (1974) (*Nixon I*). "What the separation of powers has been construed to prohibit is those arrogations of power to one branch of government which 'disrupt[] the proper balance between the coordinate branches' ... or 'prevent[] [one of the branches] from accomplishing its constitutionally assigned function....'" *Scaduto,* 763 F.2d at 1195 (*quoting Nixon II,* 433 U.S. at 443, 97 S.Ct. at 2790). The Eleventh Circuit concluded that judicial membership on the Commission interfered with the court's ability to perform its constitutionally required duties and therefore violated separation of powers. Having determined that membership of Article III judges on the Commission was improper, however, the court held that a subpoena issued by the Commission was nevertheless valid because the participation of only two judges on a commission composed of nineteen members could be readily severed from the Commission and the activities of its staff. We add that if the voluntary participation of only two judge/commissioners on this Executive Commission—notably without the authority to promulgate any substantive rules, or to investigate or prosecute any wrongdoing, or, finally to adjudicate any case or controversy—implicates separation of powers principles, then surely the Act in question does so as well.

The Third Circuit in *Scarfo, supra,* evinced similar concerns about the impartiality of the judicial branch but disagreed with the Eleventh Circuit's conclusion, relying in part on the distinction between powers conferred upon a "court" and upon a "judge." *Scarfo,* 783 F.2d at 376. The Third Circuit found the functions of the Commission to be non-judicial, observed that the services of the judges on the Commission were voluntary, and, in essence, concluded that the judge/commissioners readily could be severed from the judiciary insofar as they exercised these delegated

powers.[19]   Of interest here, however, is that court's observation that the Organized Crime Commission, *unlike* the Sentencing Commission, did not require the mandatory service of judicial members.  *Id.* at 376 & n. 3.

The defendants heavily rely on *In re Sealed Case, supra,* the most recent case to consider the extent to which a court may exercise non-Article III powers.  There, the court found a "Special Court's" exercise of executive power unconstitutional on separation of powers grounds.  Under the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591–599, a Special Court, assigned to a division of the United States Court of Appeals for the District of Columbia, was endowed with authority to appoint an independent counsel, as well as play a role in defining the counsel's jurisdiction, receive reports, and, under certain circumstances, terminate the office of counsel on its own motion.  *In re Sealed Case,* 838 F.2d at 512–15.   The court concluded that since these provisions by their nature involved the Special Court in non-Article III tasks, which it characterized as being "core functions" of the executive branch, the Act was unconstitutional.   While the functions delegated by Congress to the Special Court by nature differ sharply from those which have been delegated to the Commission, the Circuit's conclusion that the Ethics Act improperly conferred Article II power on an Article III Court is additional authority that the Act has unconstitutionally delegated non-Article III powers to the judicial branch.[20]  Moreover, the Act at issue today

---

**19.** It is beyond dispute that, at this point in our history, judges may accept certain roles outside their positions as jurists.  *See* McKay, *The Judiciary and Nonjudicial Activities,* 35 L. & Contemp.Probs. 9, 27–36 (1970) (selective summary of nonjudicial activities of Supreme Court Justices from Jay to Blackmun).  While these instances do present troubling separation of powers questions, *see generally* Liman, *The Constitutional Infirmities of the United States Sentencing Commission,* 96 Yale L.J. 1363, 1376–88 (1987); Comment, *supra* note 17; *Independence of Judges: Should They be Used for Non-Judicial Work?,* 33 A.B.A.J. 792 (1947), they generally represent situations where the judge is truly acting in an individual capacity, divorced from any judicial function.  For example, pursuant to 20 U.S.C. sections 42 and 72, the Chief Justice is named as a member of the Board of Regents of the Smithsonian Institution, and is on the Board of Trustees of the National Gallery of Art.  The Chief Justice serves in these capacities with members of the executive and legislative branches.  *See also* Meador, *The Federal Judiciary and Its Future Administration,* 65 Va.L. Rev. 1031, 1041–45 (1979).  However, it is beyond peradventure that such service is wholly separate from any judicial power vested with the Chief Justice.  Other instances of extra-judicial services such as John Jay serving as Chief Justice and Ambassador to England, and Chief Justice Warren's chairmanship of the Commission to Investigate President Kennedy's assassination likewise evidence circumstances where jurists have stepped out of their robes to perform a qualitatively different type of public service which did not implicate the judiciary as an institution.  *See generally* Scarfo, 783 F.2d at 377–80 & nn. 4–7 (noting, *inter alia,* that question of extra-judicial activity may "shade into an inquiry of standards of judicial conduct" as opposed to separation of powers).  Also, Presidential Commissions usually perform functions which are limited in scope and often are only empowered to issue reports to the President.  None have been empowered to adjudicate claims, enact or execute laws.  Constitutional infirmities arise where the judge *as* judge acts in a manner reserved for a coordinate branch.

**20.** That the Special Court at issue in *In re Sealed Case,* 838 F.2d 476 (D.C.Cir.1988), is a court *qua* court is not an obvious conclusion.  As one commentator has noted:

> The irrelevance of the term "court" to Article III restrictions on extrajudicial activities is aptly demonstrated by the Ethics in Government Act, 28 U.S.C. § 593 (1982).  Although the Constitution only allows Congress to place the appointment power in the "Courts of Law," the three judges who actually appoint an independent counsel under the Act are convened solely for that purpose and do not exist independently as a court.  *See id.*  If the three judges who appoint the independent counsel must be considered a "court," so should the three judges who sit on the Sentencing Commission.

*Liman, supra* note 19, at 1383–84 n. 148.  Indeed, the question remains as to whether the Special Court would be any more a "court" than the Commission were it stripped of its designation.  Under the Ethics in Government Act, the three judges or justices comprising the Special Court are "assigned ... to a division of the United States Court of Appeals for the District of Columbia to be a division of the court for the purpose of appointing independent counsels."  28 U.S.C. § 49(a).  Also, the Chief Justice is empowered to designate the judges that sit on that panel.  28 U.S.C. § 49(d).  However, we can see little real qualitative difference in this enabling legislation which, according to the majority opinion in *In re Sealed Case,* delegated

more pervasively implicates the judicial branch in the ongoing legislative task of promulgating substantive rules of punishment than the Ethics in Government Act impinges upon the Article II powers of the President to investigate and prosecute cases.

■ We have concluded that the Act confers upon the judiciary power that is inconsistent with its Article III function. However, this may not end our analysis. We must further determine whether the exercise of the power conferred actually violates the principles of separation of powers. The recent development of separation of powers doctrine generally has proceeded on a dual path. Where Congress has enacted legislation which expanded its own power beyond the proper boundaries of Article I, the Supreme Court has adopted a simple and highly formalistic approach. A second formulation—a more pragmatic inquiry such as the one employed by the Eleventh Circuit in *Scaduto*—has focused on the extent to which a separation of powers violation disrupts the function of the affected branch. Justice Powell, concurring in *Chadha*, set down the tests in this way:

> Functionally, the doctrine may be violated in two ways. One branch may interfere impermissibly with the other's performance of its constitutionally assigned function. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 433 [97 S.Ct. 2777, 2785, 53 L.Ed.2d 867] (1977); *United States v. Nixon*, 418 U.S. 683 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974). Alternatively, the doctrine may

be violated when one branch assumes a function that more properly is entrusted to another. *See Youngstown Sheet & Tube Co. v. Sawyer, supra*, [343 U.S.] at 587 [72 S.Ct. 863, 867, 96 L.Ed. 1153]; *Springer v. Phillippine Islands*, 277 U.S. 189 [48 U.S. 480, 72 L.Ed. 845] (1928).

*Chadha*, 462 U.S. at 963, 103 S.Ct. at 2790. While it is impossible to neatly confine this case to either analytic model, because here Congress has freely given much of its general rulemaking power to fix punishments to the judiciary, when measured against either standard the Act violates the basic principles of separation of powers.

The "formalistic" approach to separation of powers questions recently has been addressed in *Bowsher, supra*. In finding the Balanced Budget and Emergency Deficit Control Act of 1985, 2 U.S.C. §§ 901–922, unconstitutional, the Supreme Court relied on the conclusion that the Comptroller General exercised executive functions under that Act, while remaining under the control of Congress by virtue of its removal power. Therefore, the Court concluded that "Congress, in effect ... retained control over the execution of the Act and has intruded into the executive function. The Constitution does not permit such intrusion." *Bowsher*, 106 S.Ct. at 3192. The Court's analysis in *Bowsher* leaves no room for a practical assessment of the potential for disruption this overlap may cause, or the extent to which the function of the Comptroller General may be a natural extension

Article II powers, and the Act which requires the Judicial Conference to designate judges for executive appointment and delegates legislative/executive power. Some differences do exist, in that under the Act, it is basically an executive rather than judicial appointment. Yet, the Commission may function only if three judges are on the Commission and the Judicial Conference is bound by the legislation to make recommendations to the President. The conduct of the Judicial Conference, as an arm of the Court, is inextricably bound to the operation of the Commission, in much the same way as the Chief Justice and the appointed judges are to the "Special Court." Pursuant to 28 U.S.C. § 596(a)(3), the Special Court may review in a civil action the removal of the independent prosecutor, and order reinstatement or other

appropriate relief "if such removal was based on error of law or fact...." *Id.* While the Commission is granted no like power of judicial review, because its essential mission is different, that single function should not necessarily confer the status of "court" upon the Special Court while differentiating the status of the Commission. Ultimately, it is not a fair conclusion that the Commission and the Special Court are comprised of identical substantive qualities, and that they therefore must bear the same designation. However, the similarities are significant enough so that the conclusion of the District of Columbia Circuit that the Ethics Act conferred Article II power on an Article III court is persuasive authority that the presence of judges endows the Commission with the judicial qualities of a "court."

of the inherent interdependence between these two branches of government. *See id.* at 3205–3215 (White, J., dissenting); Strauss, *Formal and Functional Approaches to Separation of Powers Questions—A Foolish Inconsistency?*, 72 Cornell L.Rev. 488, 498–500 (1987); Note, *The Supreme Court—Leading Cases*, 100 Harv.L.Rev. 100, 227 (1986). In essence, the Court reasoned that since Congress had retained control over a core executive function, that Act violated the doctrine of separation of powers. *Bowsher* is instructive in this case because it requires two inquiries: first, the court must establish what branch "receives" power under the Act; and second, the court must determine the nature of the power conferred. In *Bowsher,* the Supreme Court concluded that the Comptroller General exercised executive functions, yet Congress actually retained that power because it had the power to *remove* the officer. That equation yielded an intolerable mass of authority within the legislative branch.

In this case, we have concluded that the Act has delegated substantive rulemaking power to the judicial branch. The power of judging has been joined in the same hands with the power of legislating. This also creates an unacceptable mass of authority. If measured by the "formalistic" analysis, the Act must be found unconstitutional.

We recognize that the power conferred by the Act upon the judiciary may be considered "quasi-legislative" or even executive. *See, e.g., United States v. Smith,* 686 F.Supp. 847, 862 (D.Colo.1988) (Commission exercises executive power). While we have found that the authority wielded by the Commission is essentially legislative, a different characterization would not compel a contrary result. The term "quasi-legislative" has been given vitality in the dual process of defining the type of authority vested in administrative agencies, and upholding their constitutionality against excessive delegation challenges. The Supreme Court in *Humphrey's Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935), found that the Feder-

al Trade Commission was "charged with the enforcement of no policy except the policy of the law. Its duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative." *Id.* at 624, 55 S.Ct. at 872. The Court added that "[t]he authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot be well doubted." *Id.* at 629, 55 S.Ct. at 874. As discussed *infra* § IV, we do not view the Commission as either an executive or independent agency, we merely point out here that for separation of powers analysis, essentially legislative authority vested in independent agencies has been deemed "quasi-legislative" in order to "steer[] between the Scylla of viewing the Commission as an executive agency, and hence subject to unfettered presidential removal, and the Charybdis of viewing it as part of Congress *or* the Court and hence unconstitutional on any number of other grounds." Miller, *Independent Agencies,* 1986 Sup.Ct.Rev. 41, 93 (*citing Federal Trade Commission v. Ruberoid Co.,* 343 U.S. 470, 487, 72 S.Ct. 800, 810, 96 L.Ed. 1081 (1952) (Jackson, J. dissenting)).

On the other hand, the powers of the Commission arguably may be considered executive. The Court in *Bowsher* stated that "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher,* 106 S.Ct. at 3192. Here the Commission in promulgating the Guidelines may be viewed as simply fulfilling the mandate established by Congress in the Act, and thus performing an executive function. But, regardless of the term assigned to the function exercised by the Commission, be it legislative, "quasi-legislative," or executive, and regardless of the strength of the Commission's mooring to either the legislative or executive branch, we think it clear that the Commission has been vested with a broad rulemaking power not properly exercised by the judiciary.

■ Alternatively, if measured by the

two-pronged "functional" test[21] enunciated in *Nixon II, supra,* we must still reach the conclusion that the involvement of the judiciary violates principles of separation of powers. The "potential" exists that the independence of federal judges may be affected because judges who must impose sentences under the Guidelines may be unable to impartially review them. The Framers' intention that the judges ought not write the very laws they are called upon to interpret and apply remains a real concern. It remains true that "[f]rom a body which had had even a partial agency in passing bad laws we could rarely expect a disposition to temper and moderate them in the application." *The Federalist No. 81,* at 483 (A. Hamilton). Indisputably the Act blurs the distinction between rulemaking and adjudication. This will be an ongoing concern because the application of the Guidelines will necessarily involve the resolution of many interpretive problems. And, even if individual judges were convinced that their independence and detachment from the rulemaking process was as-

sured, the public and the individual defendant's perception of the judge's role nonetheless may be tainted. *See Scaduto,* 763 F.2d at 1197.

The selection of the judges to serve on the Commission raises yet other impartiality concerns. First, because of the power associated with the position, it is not inconceivable that the judge/commissioners may have an important influence over their colleagues' view of how the Guidelines are to be interpreted and applied. This concern is increased by Congress' expressed view that "[j]udges who have had a strong voice in developing the Guidelines will be more likely to consistently and fairly apply them." H.R.Rep. 1017 at 94. We further note that the role of the Commissioners in training judges in the application of the Guidelines raises partiality concerns. Second, the influence of the judge/commissioner may create the perception that the position is a desirable one. Conduct could be motivated with a view toward a Presidential appointment. Additionally, a district judge ap-

---

**21.** The most recent application of the "functional" test by the Supreme Court has been in *Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). There, the Court determined that the CFTC, *consistent with the limitations imposed* by Article III, could entertain state law counterclaims in reparation proceedings and noted that the inquiry as to the constitutionality of Congress' delegation of adjudicative powers to a non-Article III court is "guided by the principle that 'practical attention to substance rather than doctrinaire reliance on formal categories should inform the application of Article III.'" *Id.* 106 S.Ct. at 3256 (*quoting Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 587, 105 S.Ct. 3325, 3336, 87 L.Ed.2d 409 (1985) and *citing Crowell v. Benson,* 285 U.S. 22, 53, 52 S.Ct. 285, 293, 76 L.Ed. 598 (1932)). The Court noted further that:

> [I]n reviewing Article III challenges, we have weighed a number of factors, none of which have been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary.

*Schor,* 106 S.Ct. at 3258 (citation omitted).

In *Schor,* the Court attempted to reconcile its holding with that of *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986). Although the conclusions in those two cases appear to be based on conflicting models of separation of powers analysis, the Court stated that *Schor*

> [u]nlike *Bowsher,* ... raises no question of the aggrandizement of congressional power at the expense of a coordinate branch. Instead, the separation of powers question presented in this case is whether Congress impermissibly undermined, without appreciable expansion of its own power, the role of the Judicial Branch.

*Schor,* 106 S.Ct. at 3261. This statement apparently stands for the proposition that if one branch of government has sought to expand its own power at the expense of another, then a formalistic analysis is appropriate because the aggregation of power itself is the evil sought to be eliminated. However, if there is not an affirmative grant of power to a branch, the Court will then perform a balancing test to determine whether a concurrent diminution of authority in a coordinate branch has occurred and is practically significant. In *Schor,* the Court recognized that the counterclaim asserted was a "private" right and "therefore a claim of the kind assumed to be at the 'core' of matters normally reserved to Article III courts." *Id.* at 3259 (citations omitted). However, *in looking beyond form to the substance of what Congress had done, the Court determined that agency adjudication of the claim did not "create a substantial threat to separation of powers."* *Id.* at 3260 (citation omitted). *See generally,* Strauss, *Formal and Functional Approaches to Separation of Powers Questions—A Foolish Inconsistency?,* 72 Cornell L.Rev. 488 (1987).

pointed to the Commission would receive an extra stipend for the service.

Perhaps even more fundamental is the appearance of partiality where the judiciary becomes involved with setting the public policy of crime and punishment. As we have seen, fixing the rules of punishment for all crimes calls for the integration of a variety of considerations, including the public's perception of the offense, its "seriousness," and the efficacy of deterrence, as well as resource allocation. These are exactly the types of controversial and changing policy determinations from which the judiciary traditionally has been removed. As one commentator has noted:

> Whenever issues that are highly visible and sensitive are entrusted to a public commission for resolution or recommendation, the results are unlikely to satisfy all the critics, perhaps none. Participation in such a process by members of the judiciary is less likely to settle a troublesome public issue than to lend credence to the all-too-common charge that the courts are part of the political process.

McKay, *The Judiciary and Nonjudicial Activities*, 35 L. & Contemp.Probs. 9, 25 (1970).

Surely it is not too difficult to imagine the judge/commissioners *and* the judicial branch entangled in complex, protracted and politically controversial assessments as the Guidelines are created and amended over time. Nor is it beyond reasonable possibility that the judge/commissioners may be called upon to defend in public debate the difficult choices necessarily made, conceivably in conflict with the positions taken by some of the non-judge commissioners, or by the Attorney General. These problems are necessarily exacerbated where the choices are made regularly in concert with the executive branch of government. *See* Liman, *The Constitutional Infirmities of the United States Sentencing Commission*, 96 Yale L.J. 1363, 1386 (1987). Indeed, the antagonistic positions asserted in this very case by the government on the one hand and the Commission as *amicus curiae* on the other suggest the real potential for public dispute.

Chief Justice Harlan Fisk Stone, many years ago, declined President Roosevelt's request that Stone sit on an investigating commission charged with making findings regarding a resolution of the problem of the war-time rubber supply. His rationale in declining is applicable to the issues before us. In part he said:

> [T]he rubber problem must be solved in the first instance by executive and legislative action, having important political implications, not to say repercussions. Any findings that I might make (which, unlike judicial findings, could not be restricted to evidence appearing of record), and any action I might recommend, if adopted, would almost certainly become the subject of political attack.
>
> A judge, and especially the Chief Justice, cannot engage in political debate or make public defense of his acts. When his action is judicial he may always rely upon the support of the defined record upon which his action is based and of the opinion in which he and his associates unite as stating the ground of decision. But when he participates in the action of the executive or legislative departments of government he is without those supports. He exposes himself to attack and indeed invites it, which because of his peculiar situation inevitably impairs his value as a judge and the appropriate influence of his office.

Mason, *Extra–Judicial Work for Judges: The Views of Chief Justice Stone*, 67 Harv. L.Rev. 193, 203–04 (1953). These concerns, when cast against the role the judge/commissioners must perform under the Act, are sufficiently concrete to implicate the first prong of the *Nixon* test.

■ Moreover, the separation of powers concerns that we have raised transcend the institutional effects upon the judiciary. The constitutional infirmities created by the Act also affect the defendants who must be sentenced under the Guidelines. The defendants, in the cases before us, certainly have the right to have their cases decided by judges who are free from the

power and influence of the coordinate branches of government. *United States v. Will*, 449 U.S. 200, 218, 101 S.Ct. 471, 482, 66 L.Ed.2d 392 (1980); *see also Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3256, 92 L.Ed. 2d 675 (1986).

> The constitutional doctrines implicated by this case do not concern merely questions of governmental organization and structure, but rather involve checks and balances that were designed "to protect the people from the improvident exercise of power." *Chadha*, 462 U.S. at 957 [103 S.Ct. at 2787].

*In re Sealed Case*, 838 F.2d at 509. Judicial participation in the legislative process of creating the Guidelines has surely compromised this right.

The provisions of the Act do not provide adequate insulation for these defendants from the potential for abuse of the power aggregated in the hands of the judiciary. Significantly, the Supreme Court in *Schor*, *supra*, found that the adjudicatory power vested in the Commodity Futures Trading Commission did not violate separation of powers principles because, *inter alia*, litigants were not required to forego the right to have their common claims adjudicated by an Article III court. The scheme was voluntary and merely provided an alternative forum. *Schor*, 106 S.Ct. at 3257; *see also In re Sealed Caes*, 838 F.2d at 509. While the Court recognized that the "guarantee of an independent and impartial adjudication by the federal judiciary ... serves to protect primarily personal, rather than structural, interests," *Schor*, 106 S.Ct. at 3256 (citations omitted), those personal rights were not abridged by a statute which merely provided a choice of forums. *But see id.* at 3266 (Brennan, J., dissenting).

We are unconvinced that the intangible, yet fundamental right of a criminal defendant to stand before an impartial sentencing judge, who is free from potential influence or control by a coordinate branch, *see Will*,

*supra*, can easily be reconciled with the provisions of this Act. The legislative framework that draws the judiciary into the legislative process necessarily infringes upon the personal rights of the defendants, because the Act affects the *process* of fixing punishment, not merely the resultant sentence. *Compare In re Sealed Case*, 838 F.2d at 509–11 (procedures embodied in the Ethics in Government Act unconstitutionally compromise the personal rights of the targets of investigations of special prosecutors) *with Schor*, 106 S.Ct. at 3256–57 (right to federal adjudication of state law claim is waivable). In sum, judicial participation in creating the Guidelines erodes the barriers that were erected to ensure that cases were heard by an independent, impartial judiciary.

Finally, the presence of the judges on the Commission has an impact on the operation of the judicial system as a whole because the judge/commissioners almost surely will be forced to recuse themselves from any cases which involve the Guidelines, and by increasing the workload for their brethren by their absence from the bench.[22] However, we find this consideration to be less compelling than the potentially infectious influence that judicial participation in the legislative process has on the personal right of litigants to appear before a judge who is divorced from the process of creating the law he is bound to apply.

At a minimum, then, a *"potential* for disruption is present," *Nixon II*, 433 U.S. at 443, 97 S.Ct. at 2790 (emphasis added), when judges serve on the Commission, and therefore "we [must] ... determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Id.* (citation omitted).

The power to fix punishment is inherently legislative. We can find no "overriding need" for the transfer of that broad authority to the judicial branch. In *Nixon II*, *supra*, the Court found constitutional the President Recordings and Materials Act, 44

---

**22.** Also, the appointment power gives the President a "vehicle for virtually the first time through which he can determine the assignment of sitting judges...." *Liman, supra* note 19, at 1386 (footnote omitted).

U.S.C. § 2107, which required a member of the executive branch to perform certain functions with regard to Presidential papers. In discussing the separation of powers question, the Court noted that, "it is clearly less intrusive to place custody and screening of the materials within the Executive Branch itself than to have Congress or some outside agency perform the screening function." *Nixon II*, 433 U.S. at 444, 97 S.Ct. at 2790. Here, we certainly cannot say that it is likewise less intrusive upon the judiciary for Congress to delegate this substantive rulemaking function, or that judicial participation is compelled by a need that in some manner overrides the separation of powers principle. Certainly, alternatives exist as to the creation of a Commission with expert personnel that would not implicate the judiciary in the formulation and implementation of these kinds of basic policy decisions. Unlike the Ethics in Government Act, *see In re Sealed Case*, *supra*, which was inspired by the perceived need for a prosecutor divorced from the influence of the executive, the Act is wholly without a compelling rationale for the delegation of this expansive power to the judiciary. Perhaps it may be convenient to call upon the judiciary to address the politically charged issue of sentence reform, and undoubtedly there is wisdom in having judges join formally in the decision-making process of fixing rules of punishment. The danger of impairing the integrity of the most fragile of the three coordinate branches of government is, however, real. Granting the judiciary such unprecedented power leaves these political decisions, necessarily and properly, open to challenges by the legislative and executive branches. The danger in this scheme is that in the future the force of the judicial statements likewise will be undermined.[23]

▮ In sum, the power to write the law of punishment is incongruent with the judi-

ciary's constitutional function and is more properly within the sphere of the political branch that is most responsive to the will of the people.

> "[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government...."

*Bowsher*, 106 S.Ct. at 3193–94 (*quoting Chadha*, 462 U.S. at 944, 103 S.Ct. at 2780). President Roosevelt sought Chief Justice Stone for his "Rubber Commission" because he believed that "by naming an investigating commission so thoroughly respectable that few would dare dispute its findings." Mason, *supra*, 67 Harv.L.Rev. at 201. The rationale underlying the presence of judges on the Commission appears to be similar. Perhaps the imprimatur of the courts is meant to convey the soundness of the general policy decisions reached by the Commission. However, the logical extension of the power granted in the Act is to allow the courts to determine the exact character of the conduct proscribed by the criminal code. This premise does not deposit us on "some hypothetical 'slippery slope,'" *Schor*, 106 S.Ct. at 3258, but in a very real sense represents a substantial step in embroiling the courts in the legislative process. "A healthy respect for the precipice on which we stand is warranted...." *Id.* at 3266 (Brennan, J. dissenting).

### IV.

Both the Department of Justice and the Commission have posited that the constitutionality of the Guidelines may be sustained by redesignating the Commission within the government. Apparently this

---

**23.** Since these issues involve democratic choice, it is politically illegitimate to assign them to the federal judiciary, which is neither responsive nor responsible to the public will. Moreover, it misleads the public to camouflage the legislative character of a social decision and shore up its acceptability by committing it to the judiciary, thereby cashing in on judicial

reputation. Most critically, public confidence in the judiciary is indispensible to the operation of the rule of law; yet this quality is placed in risk whenever judges step outside the courtroom into the vortex of political activity.

*Hobson v. Hansen*, 265 F.Supp. 902, 923 (D.D.C. 1967) (Wright, J. dissenting).

position is based on the premise that the constitutional infirmity of the Act is the explicit placement of the Commission in the judicial branch. 28 U.S.C. § 991(a). Accordingly, we are asked to ignore the language of the Act and the intent of Congress and impose an opposite construction—not to save the constitutionality of this Act—but to essentially create new legislation. The Department has conceded that the Commission may not properly execute its authority as part of the judicial branch. However, it contends that the Commission may constitutionally operate within the executive branch. The Commission maintains that it may function within the judicial branch consistent with the separation of powers, but that if this Court were to determine that that was an improper designation, we could sever that provision from the statute and treat the Commission as an independent agency. We reject both arguments. First, we decline to ignore Congress' patent intent in placing the Commission in the judicial branch. Second, even if we were to redesignate the Commission, this would not cure the constitutional defect created by the required presence of judges on the Commission. If the delegation conferred upon the judiciary by the Act violates separation of powers, then the power surely reverts to Congress either to exercise or redelegate. This Court does not have the authority to delegate legislative power. Indeed it would be no less a violation of separation of powers for the judges to delegate legislative authority than to exercise it themselves. In some sense it may even be a more dangerous usurpation of legislative authority.

### A.

■ The Department of Justice has conceded that the Commission may not properly function within the judicial branch. The solution offered by the Government is to simply "peel away" the judicial label and affix the Commission to the Executive Branch because the Commission performs functions which are executive in nature. This, we decline to do for a variety of reasons.

To begin with, the Congressional intent in placing the Commission in the judicial branch is indisputable. The statute explicitly designates the Commission within the judicial branch. 28 U.S.C. § 991(a). As discussed at length, *supra*, § IIA, the placement within the judiciary is not merely a trivial piece of draftsmanship, but represents Congress' view of the proper role of the judiciary and reflects the thorough integration of the judiciary into the structure and purpose of the Act. "Federal statutes are to be so constructed as to avoid serious doubt of their constitutionality." *International Association of Machinists v. Street*, 367 U.S. 740, 749, 81 S.Ct. 1784, 1789, 6 L.Ed.2d 1141 (1961); *see also Schor*, 106 S.Ct. at 3252. However,

> [w]here such "serious doubts" arise, a court should determine whether a construction of the statute is "fairly possible" by which the constitutional question can be avoided. *Crowell v. Benson*, 285 U.S. 22 [52 S.Ct. 285, 76 L.Ed. 598] (1932). *See also Machinists*, [367 U.S.] at 750 [81 S.Ct. at 1790]. It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; "'[a]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute ...' or judicially rewriting it."

*Id.* at 3252 (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964) (quoting *Scales v. United States*, 367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782 (1961))).

Second, this Act requires the presence on the Commission of three federal judges, and permits removal by the President only for cause. 28 U.S.C. § 991. The placement of the Commission in the judicial branch and the removal provisions can be viewed only as a clear attempt by Congress to insulate the commissioners from Presidential control and allow their efforts to proceed in an atmosphere of relative independence. Placement in the executive

branch would destroy that goal. The Supreme Court in *Humphrey's Executor, supra,*

> drew a sharp line of cleavage between officials who were part of the Executive establishment and were thus removable by virtue of the President's constitutional powers, and those who are members of a body "to exercise its judgment without the leave or hindrance of any other official or any department of the government," 295 U.S. at 625–626, as to whom a power of removal exists only if Congress may fairly be said to have conferred it. This sharp differentiation derives from the difference in functions between those who are part of the Executive establishment and those whose tasks require absolute freedom from Executive interference. "For it is quite evident," again to quote *Humphrey's Executor,* "that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." 295 U.S. at 629 [55 S.Ct. at 874].

*Wiener,* 357 U.S. at 353, 78 S.Ct. at 1278. The limited Presidential removal power conferred by the Act negates any contention that the commissioners serve at the will of the President, and therefore are properly part of the executive branch. Adopting the Department's position would strip from the Commission the security and freedom Congress sought to invest within it.[24] Moreover, it may well be that the Commission could not properly function as an executive Commission if the President's removal power were so severely constricted. Such an interpretation of the Act would raise separation of powers problems of its own.

■ Additionally, even if we were to ignore the language and purpose of the Act and recast the Commission as an "executive" Commission, this would not purge the Act of its constitutional infirmities. Separation of powers principles are violated here because of the integration of the judiciary, both on an institutional and individual level, with the process of substantive rulemaking. The conclusion that the Act is unconstitutional does not rest merely on its textual placement in the judiciary, *cf.* Strauss, *supra,* 72 Cornell L.Rev. at 493, but on the functions judges are required to perform under its mandate. Were the Commission to carry out its mission "within" the executive agency the central objections of judicial participation in the ongoing formulation of fundamental policy decisions in concert with the executive branch would still exist. Notwithstanding any redesignation, judges would be directly involved in the legislative process and be required to write the laws that they must interpret.

We have determined that the authority exercised by the Commission is essentially legislative. *See supra,* § IIB. However, even assuming *arguendo* that the authority may be termed executive because the Commission effectively "[i]nterpret[s] a law enacted by Congress to implement the legislative mandate. . . ." *Bowsher,* 106 S.Ct. at 3192, the infirmities associated with judicial participation in the Commission nevertheless are present. The violation of separation of powers principles rests fundamentally on the composition of the Commission, and the actual authority it exercises. The characterization of the power as "executive" would not alter the cen-

---

**24.** As Judge Greene has recently observed in *U.S. v. Brodie,* 686 F.Supp. 941, 947–48 (D.D.C. 1988), the placement of the Commission in the executive branch would have a number of tangible effects:

> Among the consequences flowing from a unilateral rectification by the courts of what the Department of Justice regards as the Congress' unfortunate error would be (1) the application to the Commission of the Freedom of Information Act, 5 U.S.C. § 552, the Privacy Act, 5 U.S.C. § 552a, and the Federal Advisory Committee Act, 5 U.S.C.App. I, all of

which govern executive but not judicial agencies; (2) the vesting in the President of the power to reduce the Commission's budget; (3) the application to the Commission staff of such laws as the conflict of interest statutes, *e.g.,* 18 U.S.C. § 207–208, prohibitions on discrimination, 42 U.S.C. § 2000e–16(a), and various civil service laws, 5 U.S.C. §§ 2102–03; and (4) the inability of the judge-members of the Commission to sit on any cases which involve any part of the Executive Branch. *In Re Murchison,* 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942] (1955).

tral objection of judicial participation. Finally, we can find no comparable executive rulemaking agency that requires judicial service, or otherwise implicates the judiciary as thoroughly as does this Act. We offer no opinion as to whether Congress could delegate this authority to an executive agency. We simply find that it did not. And, we decline the government's invitation to "correct" the legislative intent, completely recast the Act and impose a contrary meaning upon an explicit Congressional declaration.

### B.

■ The Commission's contention that for separation of powers purposes it simply may be designated as an independent agency like the Federal Trade Commission or the Securities and Exchange Commission likewise cannot save the Act. Again, we must emphasize that the Act textually places the Commission in the judicial branch because such placement is wholly consonant with the Congressional view of the Commission's role. We note further that Congress has established independent agencies to oversee a broad spectrum of matters.[25] The enabling legislation generally designates those entities as independent. Some of these agencies are established within the executive branch. *See, e.g.*, 12 U.S.C. §§ 1811–1831 (Federal Deposit Insurance Corporation); 12 U.S.C. § 1437 (Federal Home Loan Bank Board). *See generally* 1 J. Stein, G. Mitchell, & B. Mezines, *Administrative Law* § 4.01, at 4–6 & n. 16 (1988). Others have been denominated independent and not assigned to any particular branch of government. *See, e.g.*, 7 U.S.C. § 4a (Commodity Futures Trading Commission); 15 U.S.C. § 41 et seq. (Federal Trade Commission). *See generally* 1 J. Stein, G. Mitchell, & B. Mezines, *supra*, § 4.01, at 4–6—4–7 & n. 17. No

independent agency heretofore has been assigned to the judicial branch. To assert that the Commission simply can be redesignated as "independent" trivializes Congress' decision to place it in the judiciary, and ignores the structure the Act has created. Moreover, the basic separation of powers problems would remain even were the Commission deemed independent of the judicial branch. The institutional involvement of the judiciary exists by the very terms of the Act notwithstanding its "placement." Mere relabeling would not obviate this infirmity.

Further, even if we could ignore the Congressional intent, and pass by the infirmity of judicial participation, designating the Commission as an independent agency would be improper because the Commission does not possess many of the salient qualities that define such an agency. "Administrative agencies are independent and not wholly within the three branches of government because the functions that are assigned to them cannot be classified as purely legislative, executive or judicial." 1 J. Stein, G. Mitchell, & B. Mezines, *supra*, § 4.01, at 4–9. The distinctive feature of independent agencies is their integration of judicial, legislative and executive powers so as to provide expertise and address a particular subject matter or problem area. The authority is derived from a Congressional delegation, yet it is exercised independent of any one branch.

Almost uniformly, [independent commissions] display the following characteristics: (1) leadership by a multi-member panel; (2) political criteria for appointment, with no more than a majority from one party; (3) broad rulemaking authority; (4) power to conduct on-the-record adjudicative hearings; (5) power to conduct investigations and to bring enforcement actions either in court or within the

---

**25.** *See, e.g.*, Commodity Futures Trading Commission, 7 U.S.C. § 4(a); Consumer Product Safety Commission, 15 U.S.C. § 2053; Equal Employment Opportunity Commission, 42 U.S.C. § 2000e–4; Federal Communications Commission, 47 U.S.C. § 151; Federal Deposit Insurance Corporation, 12 U.S.C. § 264; Federal Election Commission, 2 U.S.C. § 437c; Federal Labor Relations Authority, 5 U.S.C. § 7104; Federal Maritime Commission, 46 U.S.C. § 1111; Board of Governors: Federal Reserve System, 12 U.S.C. § 241; Federal Trade Commission, 15 U.S.C. § 41; National Labor Relations Board, 29 U.S.C. § 153; Nuclear Regulatory Commission, 42 U.S.C. § 5841; Securities and Exchange Commission, 15 U.S.C. § 78d; United States International Trade Commission, 19 U.S.C. § 1330.

agency itself or both; (6) a specialized mandate directing the agency to focus either on particular industries or on specific cross-cutting problems; and (7) restrictions on the presidential removal power. In addition, most independent agencies enjoy a measure of discretionary authority over matters such as budget, relations with Congress, and positions taken in litigation. Miller, *supra,* 1986 Sup.Ct.Rev. at 51. While the Commission combines personnel from the judicial and executive departments, and exhibits some of the qualities noted above, such as a focused agenda, as well as expert and politically diverse membership, it simply does not possess the unique attributes of an independent agency. The Commission does not blend the *power* of the three branches of government; rather it blends the *personnel* and merely promulgates binding rules. Certainly, the Commission in creating the Guidelines exerts legislative power. However, the Commission has no executive or judicial authority.

Unlike virtually all independent agencies, the Commission is without any enforcement apparatus. It is without the authority to conduct investigations, other than general fact-finding which is ancillary to its rulemaking function, or enforce or in any way effectuate its mandate. Yet, independent agencies usually are empowered to investigate whether a law or agency regulation has been violated so that the appropriate proceedings may be instituted. *See, e.g.,* 15 U.S.C. § 78u (Securities and Exchange Commission). The Commission is powerless to affect or ensure the implementation of the Guidelines it creates. Moreover, it holds no other type of executive authority often exercised by independent agencies such as licensing or registration. *See generally,* Schwartz, *Administrative Law,* § 1.7, at 15–16.

The Commission also has no adjudicative functions. Yet, independent agencies generally have the power to resolve disputes in a manner similar to a court. *See Schor, supra; Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). While a defendant may petition the Commission for review of the Guideline criteria applicable to his case, 28 U.S.C. § 994(s), that assessment must be made generally. Otherwise, the Commission's powers do not, in any way, approach a judicial authority.

One of the hallmarks of agency power is the ability of the agency to bring an enforcement action, whereby the agency asserts the power of the executive in investigating and bringing the action, as well as the power of the judiciary in adjudicating the action based upon rules it has promulgated. In such a circumstance, the three governmental functions coalesce. The decision by the agency is then subject to further review by an Article III court. Here, the Commission engages in rulemaking and nothing more.

In essence, the Commission holds few of the characteristics of classic independent agencies, and we note that "[f]rom a strictly analytical perspective ... it has become increasingly difficult to distinguish independent from executive agencies ... [B]oth types of agencies engage in adjudication ... [and] in rulemaking." Entin, *The Removal Power and the Federal Deficit: Form, Substance, and Administrative Independence,* 75 Ky.L.J. 699, 768 (1987); *see also* Bruff, *On the Constitutional Status of the Administrative Agencies,* 36 Am.U. L.Rev. 491, 499 (1987); *Miller, supra,* 1986 Sup.Ct.Rev. at 73–74. The Commission's invocation of the independent commission theory as a means of sustaining the constitutionality of the Guidelines must be seen as being based partly on the President's limited removal power; partly on the text of the enabling legislation which identifies the Commission as independent; but perhaps most precisely on the hope that such a designation would cast the work of the Commission as part of "a neutral and expert process, above the unseemly strife of politics." Bruff, *supra,* 36 Am.U.L.Rev. at 499 (noting the original goal in creating administrative agencies as recognized by the Supreme Court); *see Humphrey's Executor,* 295 U.S. at 625–26, 55 S.Ct. at 872–73. In fact, we have found that the work of the Commission places the judiciary in the political maelstrom to resolve

the controversial matter of sentence reform. While a properly constituted agency may be delegated with such a task, the involvement of judges in this venture defines the constitutional infirmity. Their participation is crucial to the legislative scheme, yet improper whether or not the Commission is designated "independent." *Cf.* Miller, *supra,* 1986 Sup.Ct.Rev. at 74 ("Because independent agencies are not thought subject to Congressional oversight, they can be given the power to decide politically controversial matters without accentuating the power of the President.").

Finally, the presence of judges on such an independent agency is unprecedented. No other independent agency that we can find requires judicial participation, and no judges currently serve. *See generally* 1987/88 *United States Government Manual.* In fact, the enabling legislation of independent agencies almost uniformly make no mention of who must be members, and require that no commissioner engage "in any other business, vocation or employment." *See, e.g.,* 15 U.S.C. §§ 41 (Federal Trade Commission), 78d (Securities and Exchange Commission). Accordingly, we reject the contention of the Commission that by simply redesignating it as independent, the constitutional infirmities caused by judicial participation would be cured.

## V.

For the foregoing reasons we conclude that the Act is unconstitutional and, until we receive contrary guidance from a higher authority, the Guidelines will not be applied in this district. We must now consider whether such a conclusion mandates striking the entire Act, or simply those sections creating and empowering the Commission. Although much attention has been focused on the Commission, the Act also effects other significant changes in federal sentencing. Most notable is the Act's requirement of the imposition of "real time" sentences and the elimination of the Parole Commission.

The Supreme Court has declared that courts should refrain from invalidating more of a statute than is necessary. Whenever possible, the Court should sever the objectionable provisions and maintain the remaining act as valid. *See, e.g., Alaska Airlines, Inc. v. Brock,* 480 U.S. 678, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987). Thus, this Court must determine whether the constitutional defect in the Commission invalidates the entire Act, or whether certain provisions can survive.

Considering that the question of severability has not been briefed, and recognizing that the parties may wish to be heard on this important question, we direct the parties to submit memoranda concerning the severability issue within *ten days* of the date of this Order. Accordingly it is hereby

ORDERED AND ADJUDGED as follows:

1. The Guidelines are found unconstitutional and shall not be applied in the Southern District of Florida; and

2. The parties shall file memoranda regarding the issue of severability within ten (10) days of the date of this Order.

ARONOVITZ, District Judge (concurring specially):

I specially concur in the majority opinion of my colleagues that the separation of powers doctrine as applied to the Guidelines portion of the Sentencing Reform Act of 1984 renders it unconstitutional. However, I am convinced that the matter should be addressed further on other issues because of the seriousness of its effect on the judicial system. The inevitable recurrence of the dispute over the Sentencing Guidelines, and the likelihood of future challenges on additional grounds, makes it prudent to address them at this stage. *C.f. Synar v. United States,* 626 F.Supp. 1374, 1382–1383 (D.D.C.), *affirmed sub nom. Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986); *Hagans v. Lavine,* 415 U.S. 528, 546, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974) (doctrine of constitutional decision-avoidance is not ironclad).

In addition to the separation of powers problems discussed in the Court's opinion,

it is clear that the delegation of legislative power to the Sentencing Commission is so excessive as to violate the basic premises of our constitutional scheme of government. *See A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935). Under the prevailing test, Congressional delegation of legislative or quasi-legislative power is proper if Congress "shall lay down by legislative Act an intelligible principle to which the person or body authorized to [exercise the delegated power] is directed to conform...." *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928). An intelligible and meaningful standard is necessary to ensure that in implementing Congressional policy, an agency operates within the law, rather than being left to create law of its own, which would constitute an intolerable abdication of the legislative function to unelected officials. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976); *Yakus v. United States,* 321 U.S. 414, 425, 64 S.Ct. 660, 667–668, 88 L.Ed. 834 (1944).

The application of the "intelligible principle" test is essential in the context of a Commission which functions to determine the penalties attaching to federal crimes. Where fundamental rights and liberties of individuals are implicated, delegation of legislative authority must be scrutinized with particular care, and, if necessary to preserve the constitutional validity of enabling legislation, the delegation will be narrowly construed. *Kent v. Dulles,* 357 U.S. 116, 129, 78 S.Ct. 1113, 1120, 2 L.Ed.2d 1204 (1958); *Ernst & Ernst,* 425 U.S. at 213–214, 96 S.Ct. at 1391.

Moreover, fixing punishment has repeatedly been held to be a uniquely legislative function. *Whalen v. United States,* 445 U.S. 684, 688–689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980); *United States v. Evans,* 333 U.S. 483, 486, 68 S.Ct. 634, 636, 92 L.Ed. 823 (1948). Indeed, it may reasonably be questioned whether delegation of such "fundamental moral judgments" is

ever appropriate. *See* Liman, *The Constitutional Infirmities of the United States Sentencing Commission,* 96 Yale L.J. 1363 (1987). Even admitting of some limited delegability, however, it is clear that the enabling act under which the Sentencing Commission regulates imposes no meaningful limit on administrative discretion.

Despite an appearance of considered control, the Guidelines portion of the Act is but an importuning that the Sentencing Commission exercise some rational discretion in formulating sentencing procedures. Few meaningful restrictions on this discretion are set forth. It is primarily for the Sentencing Commission to determine whether punishment by fine, incarceration, or probation is most appropriate, and to determine the amount of fine or the length of incarceration which should be imposed.

The Commission is directed to consider such open-ended concepts as the "grade of the offense," the "circumstances under which the offense was committed," and the "community view of the gravity of the offense," 28 U.S.C. Section 994(c), but is given no indication of the means by which these factors are to be determined, or their relative importance. In fact, the Commission is specifically directed to take the aforementioned matters into account "only to the extent that they do have relevance." This preliminary determination of relevance constitutes the demarcation of the "field within which the [regulatory body] must act," *Yakus,* 321 U.S. at 425, 64 S.Ct. at 668, and the result of its delegation to the Sentencing Commission is an inability to determine whether the actions of the Commission are in compliance with the legislative will. It is in this sense that Congress has most obviously failed to express meaningful and intelligible principles to guide the Commission.

In instances where the Guidelines impose a term of imprisonment, the Act restricts the amount by which the range may vary to the greater of 25 percent or six months. 28 U.S.C. Section 994(b)(2). In the context of the broad sentencing ranges which currently prevail in our criminal code, this restriction has the paradoxical effect of

increasing the substantive significance of the Guidelines promulgated by the Commission. By limiting sentencing at one or the other end of the statutory range, the Commission has the power to fundamentally reorder our criminal code of behavior—a task the delegation of which must be accompanied by the most restrictive legislative conditions, if it may be delegated at all.

The Commission's responsibility for establishing categories of defendants reflects a similar delegation of authority to determine substantive policy. The Commission is directed to assure that the Guidelines it promulgates reflect the "general inappropriateness" of considering education, vocational skills, and certain other individual characteristics, 28 U.S.C. Section 994(e), and to this extent the delegation is accompanied by more detailed principles than is the Commission's responsibility for determining offense categories. Because the Commission is vested with the ultimate responsibility for determining the relevance of various characteristics distinguishing criminal defendants, however, the tentative exclusion of certain mitigating characteristics does not amount to an intelligible and meaningful limitation of the Commission's authority.

In addition, the Sentencing Guidelines promulgated by the Commission are constitutionally infirm because they violate the Due Process Clause of the Fifth Amendment. Consideration of the individual characteristics of a defendant and the circumstances of the crime he has committed is an historical function of a sentencing court. Such individualized sentencing is essential to ensure that there is a rational relationship between the finding of guilt and the punishment imposed. "So that the punishment fits not only the crime but the defendant as well, a sentencing judge must have 'the fullest information possible concerning the defendant's life and characteristics.'" *United States v. Fulbright*, 804 F.2d 847, 853 (5th Cir.1986), quoting *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949).

The Sentencing Guidelines severely limit the traditional discretion of the sentencing judge by removing entirely consideration of certain characteristics of the defendant and allowing other characteristics to be considered only for limited purposes. Application of the Guidelines negates the judge's knowledge of the defendant which has previously been considered essential to the sentencing process. To the extent that courts are no longer free to consider the individual circumstances which might mitigate sentencing, punishment within a narrowly circumscribed range, which is predetermined by application of a mechanistic administrative formula, must be considered so arbitrary as to violate the Due Process Clause.

The right to individualized sentencing in a noncapital case has been considered to arise from legislative initiative rather than the Constitution. *Sumner v. Shuman*, —— U.S. ——, 107 S.Ct. 2716, 2722, 97 L.Ed.2d 56 (1987). It does not follow that in removing or circumscribing sentencing discretion, the legislature is free to erect a system of sentencing which precludes, in effect, the presentation of significant exculpatory evidence, whether that evidence bears on the establishment of the elements of the offense or the imposition of the sentence. In so doing, the Guidelines portion of the Act, and the Guidelines themselves, trample a defendant's right not to be sentenced on the basis of invalid premises or inaccurate information. *United States v. Satterfield*, 743 F.2d 827, 840 (11th Cir.1984); *United States v. Hodges*, 556 F.2d 366, 369 (5th Cir.1977).

I recognize that it is within the sound discretion of the legislature to determine, in the first instance, the factors and circumstances to be considered during sentencing. Legislative initiative must always be confined by the due process accorded a criminal defendant, however, and where, as here, the implementation of legislative policy conflicts with rights of a constitutional magnitude, the latter must prevail.

GONZALEZ, District Judge, dissenting:

I remain unconvinced that any constitutional violation has occurred.

Article I of the Constitution of the United States vests "[a]ll legislative Powers ... in a Congress of the United States...."

Whether the sentencing discretion of federal judges should be limited and whether a system of guidelines is desirable must be left to the wisdom of Congress.

Since I can find nothing in the Constitution to prohibit the Congress from legislating unwisely, I must respectfully dissent.

NESBITT, District Judge, dissenting, in which SCOTT, District Judge joins:

I respectfully dissent. It would serve no useful purpose to repeat the statutory framework and the various challenges to the Sentencing Act which have been well reviewed by Judge Marcus in the majority opinion. My view is that the Sentencing Reform Act of 1984 is constitutional. The reasons for this conclusion are expressed in the fully-explored opinion of Chief Judge Rothstein of the Western District of Washington which rejects the constitutional and statutory challenges to the Act and concludes that "the Commission's placement, composition and authority are constitutionally permissible as being in aid of the performance of a judicial function assigned to the Judicial Branch by Congress, rather than the Constitution." *United States v. Amesquita–Padilla*, 691 F.Supp. 277, Order Denying Motion to Preclude Use of Sentencing Guidelines, at 290 (W.D.Wash.1988).

ATKINS, Senior District Judge, dissents.